THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FREEL CALLAHAN, Plaintiff in Error.

*Opinion filed December 23, 1926.*

1. CRIMINAL LAW—*what is sufficient to prove felonious entry of chicken house.* Burglary can seldom be proved by the direct and positive evidence of witnesses who have knowledge of the actual breaking and entry, and the facts that there were no eye-witnesses to the burglary of a chicken house and that the chickens were last seen in the chicken yard in the evening of the day before their loss was discovered are not sufficient to defeat the inference from other circumstances in evidence that they were taken from the chicken house during the night, as the conclusion may naturally be drawn that the chickens went into the chicken house where they were accustomed to roost and were not taken from the yard.

2. SAME—*what is meant by sufficient or satisfactory evidence.* What constitutes sufficient or satisfactory evidence in a particular case cannot be defined in advance, but the circumstances in evidence will amount to such proof if they are sufficient to satisfy the unprejudiced mind and conscience of an ordinary person beyond a reasonable doubt, or to so convince him of the fact in question that he would venture to act upon his conviction in matters of the highest concern and importance to his own interests.

3. SAME—*what is sufficient to establish corpus delicti.* There is no invariable rule as to the quantum of proof necessary to establish the *corpus delicti,* as each case must depend, in a measure, upon its own particular circumstances, and often the facts and circumstances from which the *corpus delicti* is proved are those which connect the accused with the commission of the offense.

4. SAME—*what is sufficient to prove ownership of building burglarized.* In burglary the ownership of the building entered may be laid in the occupant whose possession is rightful as against the burglar, and ownership of a chicken house alleged to have been burglarized is sufficiently established by proof of possession of the farm where the chicken house was located and of possession of the chickens alleged to have been taken from the chicken house.

5. SAME—*rule of idem sonans applies to criminal proceedings— indictment.* The rule of *idem sonans* applies to both civil and criminal proceedings, and a variance as to names alleged in an indictment and proved by the evidence is not to be regarded as material unless it shall be made to appear to the court that the jury was misled by it or that some substantial injury was done to the accused thereby, such as that by reason thereof he was unable to intelligently make his defense or was exposed to the danger of a second trial on the same charge.

6. SAME—*what is not material variance in name as alleged and proved.* The fact that an indictment for burglary alleges the ownership of the premises entered and the property taken to be that of Claude and Elza Mills while the proof shows that the name of the latter person was Elga does not constitute such a material variance between the indictment and the proof as to subject the defendant to the probability of being called upon to answer to a charge of the same burglary of the premises of Elga Mills.

7. SAME—*evidence as to conduct of chickens is competent in a prosecution for burglary of chicken house.* In a prosecution for burglary of a chicken house, evidence may be admitted that the chickens, when returned to the chicken yard after their recovery by their owners, went to the door of the chicken house in the evening and waited to be let in and went to roost in their accustomed places.

8. SAME—*when, only, will verdict of jury be disturbed.* Where the evidence is contradictory it is for the jury to determine what witnesses are entitled to the greatest weight and credit, and it is only when a reviewing court is satisfied, from a consideration of the entire record, that there is a reasonable doubt of the defendant's guilt that the verdict and judgment will be disturbed.

WRIT OF ERROR to the Circuit Court of Vermilion county; the Hon. AUGUSTUS A. PARTLOW, Judge, presiding.

ACTON, ACTON & SNYDER, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ELMER O. FURROW, State's Attorney, and HARLINGTON WOOD, (O. S. LONGENECKER, and J. H. LEWMAN, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Freel Callahan (hereinafter referred to as plaintiff in error) and Howard Lawrence were indicted at the May term, 1926, of the circuit court of Vermilion county. The first count of the indictment charged that they broke and entered the chicken house of Claude and Elza Mills and stole thirty buff orpington chickens, the property of Claude and Elza Mills. The second count charged the same crime, the doors and windows of the building being open. Each defendant pleaded not guilty. They were tried together. Callahan was found guilty as charged in the indictment and Lawrence was acquitted. The court overruled motions for a new trial and in arrest of judgment and rendered judgment upon the verdict, sentencing plaintiff in error to the penitentiary. He has sued out this writ of error to review the judgment.

The principal errors assigned and argued are: (1) There was no proof of a felonious entry of the chicken house; (2) the allegation of ownership of the premises was not supported by the proof; (3) the ownership of the chickens was not proved as alleged; (4) there was a variance in the proof of ownership of the premises claimed to have been entered and the property alleged to have been stolen; (5) the court admitted incompetent evidence; (6) the court erred in the giving of instructions for the People

and in refusing certain instructions offered by the defendants; (7) the verdict is not supported by the evidence.

The evidence produced by the State was in substance as follows: Claude Mills and his wife, Elga, (who the testimony shows was also known as Elza,) resided for several years on a farm which was leased by Mills and his brother, Dale, located in Vermilion county about three and one-half miles northwesterly from the town of Ridgefarm. About one hundred feet from the residence occupied by the Mills was the chicken house, and in front of and adjoining the chicken house was a wire enclosure or feeding pen about twenty feet square. There was a gate into the wire enclosure and a door leading into the chicken house from the pen. On Saturday evening, April 24, 1926, the Mills owned a flock of about fifty-five or sixty buff orpington chickens, which were fed in the pen about six o'clock Saturday evening. The Mills left the farm between 7:00 and 7:30 on that evening, and at the time they left a part of the chickens were still in the pen and a part had gone to roost in the chicken house. The gate to the enclosure was left open and the door to the chicken house also was open. The Mills were away until eleven o'clock that night. It rained most of Saturday. The next day, Sunday, the Mills were home all day. During that morning Mills was outside but paid no particular attention to the chickens or the chicken house. That evening, about five o'clock, Mills went to feed the chickens, and it was discovered that at least twenty-five or thirty chickens had disappeared. An investigation was commenced, and it was found that plaintiff in error and Howard Lawrence came in a Ford coupe into the village of Sidell on Monday morning, April 26, about nine o'clock. This town is located about ten miles west of the residence of the Mills. Plaintiff in error had seventeen buff orpington chickens in the Ford coupe, and he sold them for $23.50 to James Swinford, who lived in Sidell and who testified he was in the poultry business. The chickens

were taken out of the car and turned loose in Swinford's
barn.   There were no other chickens in the barn at the time.
Within a very short time after the sale of the chickens to
Swinford the latter sold the same chickens for over $26
to Fred Chew, who conducted a poultry business there.
The chickens were taken in a coop from Swinford's barn
to Chew's poultry house.   Within about a half hour after
the purchase by Chew of the chickens Mr. and Mrs. Mills
appeared at his place of business and proceeded to examine
the seventeen buff orpington chickens, which were still in
the same coop.   In their presence the chickens were taken
out of the coop one at a time, and after taking out three
or four of the chickens, one having a peculiarly crooked
back was discovered by Mrs. Mills which she testified looked
a whole lot like a crooked-back chicken which was in their
flock.   The coop of chickens was placed in the possession
of a deputy sheriff at Sidell and a warrant was issued for
the arrest of plaintiff in error and Lawrence.   The chickens
were not returned to the Mills home until late Tuesday
night, April 27.   They were left in the pen during that
night and the next day.   On the day after the return of
the seventeen chickens to the pen at the Mills home Mrs.
Mills discovered a second crooked-back chicken like one
she formerly had in her flock.   It appears that when the
door to the chicken house was opened the chickens which
had been returned went into the chicken house, flew up on
the self-feeder which was in the chicken house, and from
there onto the roost, where the Mills chickens had been ac-
customed to roosting during the previous winter months.
One witness for the State who was a storekeeper in Ver-
milion Grove testified he saw plaintiff in error and Lawrence
drive by his place in a car about a quarter to eight on Mon-
day morning.   The State's evidence also showed that a dep-
uty sheriff of Vermilion county and a special deputy sheriff
visited the home of plaintiff in error about 8:30 Monday
night, April 26.   Upon knocking, plaintiff in error came

to the door, and the deputy sheriff said he had a warrant for him. The latter said to wait until he got his hat or shoes. The deputy sheriff stepped inside and the special deputy started around the house. Plaintiff in error went out the back door and fled, and though the special deputy shot at him, he did not stop and was not seen again that night. On Tuesday afternoon, April 27, another special deputy sheriff of Vermilion county, Illinois, and the sheriff of Vermilion county, Indiana, called at the home of Piatt Callahan, a brother of plaintiff in error, who lived just across the State line in Indiana, about twenty or twenty-two miles east of Sidell. The sheriff went to the front door and talked to Piatt while the special deputy sheriff went around the house. The special deputy saw plaintiff in error run out back of the house and down through the woods and into a ravine some 200 yards, and the deputy finally stopped him by shooting at him. Plaintiff in error inquired whether they had a warrant for him and came back to where the officers were. Lawrence, the other defendant, also came from the house toward the officers, and the two men were taken into custody. The officers found a Ford coupe at Piatt Callahan's house, and upon examination found it covered with mud and without a license plate, and also found yellow chicken feathers in the car. Plaintiff in error and Lawrence were taken to the county jail at Danville, Illinois, and upon being interrogated that night plaintiff in error said that he got the chickens from his brother, Piatt, who owed him a debt of some $60; that his brother had all kinds of chickens, but that he gave him buff orpington chickens for the reason that they were the oldest. Plaintiff in error also told some of the officers that he stayed all night at his own home on Monday night after the officers had been there for him, and that he went to his brother's on Tuesday morning. Mills and his wife each testified they owned the flock of chickens on the farm, and that they were in possession of the farm, and the buildings

thereon, at the time the chickens disappeared. Each of these witnesses identified the seventeen chickens found in the coop as being a part of their flock, and each of them further testified concerning the identity of the two chickens with the peculiarly marked or crooked backs.

Plaintiff in error testified in his own behalf and denied that he had stolen or taken the chickens from the Mills farm. Howard Lawrence, who was indicted and tried with plaintiff in error, also testified at the trial. The explanation relative to the possession and sale of the chickens by plaintiff in error and Lawrence was, that during January, 1926, plaintiff in error purchased eighteen buff orpington chickens from Mrs. Tuggle, a sister-in-law of Lawrence; that plaintiff in error took these chickens to his brother Piatt's place, who lived just across the Indiana State line, and made arrangements for the chickens to be kept there until plaintiff in error should move to a place that was fitted for the raising of chickens. He and Lawrence were arranging to do some timber work and needed money for the purchase of tools, etc. Plaintiff in error, who lived in Indianola, Illinois, a small town located between Sidell and Ridgefarm, went to see Lawrence, who lived about two and a half miles east, on Sunday afternoon, April 25, for the purpose of getting Lawrence to drive his Ford coupe over to Piatt Callahan's in order to get some money that Piatt owed plaintiff in error. He testified he had sold Piatt a Chevrolet automobile during the early part of 1926, and that he went over to Lawrence's house early Monday morning and from there drove with Lawrence in the latter's Ford coupe to Piatt's house, where they arrived about eight o'clock. Piatt was not at home, and on that account plaintiff in error decided to take his own chickens for the purpose of selling them and by that means raise the necessary money to buy the tools he needed. Accordingly, with the assistance of Piatt's wife, the chickens were caught, placed in the Ford coupe and the two men drove to Sidell, where they arrived

about nine o'clock, and sold the chickens to Swinford. Thereafter they spent part of the day in Danville and then returned home. Plaintiff in error was corroborated to some extent by Mrs. Piatt Callahan, who testified that he and Lawrence were at her house about eight o'clock Monday morning and that she caught seventeen buff orpington chickens, which the two men took away with them that morning. She also stated that plaintiff in error had brought eighteen buff orpington chickens to her in January and she had taken care of them for him, and that her husband owed plaintiff in error some money for the purchase of a Chevrolet automobile. Mrs. Tuggle also testified to having sold eighteen buff orpington chickens to plaintiff in error during January, 1926. By several other witnesses plaintiff in error showed his whereabouts on Saturday night from about seven o'clock in the evening until he went home, in the neighborhood of 11:00 or 11:30 P. M. Plaintiff in error further testified that he was at his father's a part of Sunday and was at defendant Lawrence's house during a part of Sunday afternoon. He denied running away from the officers when he was at his brother's house on Tuesday, April 27. He also denied having made any statements to the officers at the jail in Danville on Tuesday night relative to having taken the chickens on a debt. He maintained that he owned the chickens and that his brother's wife had been keeping them for him.

The above is the substance of the most important testimony produced at the trial.

It is first contended there was no proof of a felonious entry. The proof shows that Mills and his wife were living upon and in possession of the leased farm and the buildings thereon and owned a flock of fifty-five or sixty buff orpington chickens, which had been roosting upon the roosts in the chicken house all during the previous winter months. There is no question but that twenty-five or thirty chickens out of the Mills flock disappeared from the

premises between seven o'clock Saturday night and five o'clock P. M. Sunday, and it is quite improbable that the chickens were stolen in broad daylight. There was no proof in the record that this flock of chickens, or any of them, ever roosted in a tree, on a fence, or any other place except in the chicken house, which adjoins the feeding pen. We think we are warranted in saying that from one's common knowledge of the habits and propensities of chickens, the only reasonable conclusion that can be drawn from the evidence in the record is that these chickens went to roost in the chicken house on Saturday night and were taken from that building some time during that night. It is seldom that burglary can be proved by the direct and positive evidence of witnesses who have knowledge of the actual breaking and entry. The inference of guilt, in most instances, must necessarily be drawn from other facts satisfactorily proved. By satisfactory evidence—which is sometimes called sufficient evidence—is intended that amount of proof which ordinarily satisfies an unprejudiced mind beyond reasonable doubt. The circumstances which will amount to this degree of proof can never be previously defined. The only legal test of which they are susceptible is their sufficiency to satisfy the mind and conscience of a common man and so convince him that he would venture to act upon that conviction in matters of the highest concern and importance to his own interests. (4 R. C. L. par. 37, p. 442.) In the instant case the proof shows possession of buff orpington chickens by plaintiff in error soon after the alleged burglary at the Mills farm; the identification of at least part of the chickens by the owners; evidence of conflicting statements made by plaintiff in error as to why he took the chickens from his brother's farm on Monday morning; and that plaintiff in error fled on two occasions before being taken into custody. Often the facts and circumstances from which the *corpus delicti* is proved are those which connect the accused with the commission

of the offense. There is no invariable rule as to the quantum of proof necessary to establish the *corpus delicti*. Each case must depend, in a measure, upon its own particular circumstances. (*People* v. *Goodwin,* 263 Ill. 99; *People* v. *Sapp,* 282 id. 51.) The explanation of the possession and sale of the chickens by plaintiff in error, in the judgment of the jury, evidently was not sufficient to raise a reasonable doubt as to his guilt of the crime of burglary, and we think the jury was justified in its conclusion.

There is no merit in the second and third errors assigned. In burglary, the ownership of the building entered may be laid in the occupant whose possession is rightful as against the burglar. (*Smith* v. *People,* 115 Ill. 17.) The undisputed testimony is that Mills and his wife were in possession of the farm and chicken house and were the owners of the chickens alleged to have been stolen.

The fourth error arises on account of the indictment charging the ownership of the premises entered and the property stolen to be that of Claude and Elza Mills, while it is claimed the proof shows the name of the wife was Elga rather than Elza. The rule of *idem sonans* applies to both civil and criminal proceedings, and where the name as written in the indictment may be pronounced in the same way as the name given in the evidence, although such may not be the strictly correct pronunciation, the variance will not be regarded as fatal unless the variant orthography be such as would be likely to mislead the defendant in preparing his defense. (14 R. C. L. par. 51, p. 207.) The more modern rule is, that a variance as to names alleged in an indictment and proved by the evidence is not to be regarded as material unless it shall be made to appear to the court that the jury was misled by it or that some substantial injury was done to the accused thereby, such as, that by reason thereof he was unable to intelligently make his defense or was exposed to the danger of a second trial on the same charge. (*People* v. *Gormach,* 302 Ill. 332; *People* v. *Weis-*

*man,* 296 id. 156.)    Plaintiff in error was in no way preju-
diced in making his defense, and there is no probability,
from the evidence, that he will ever be called upon to an-
swer to a charge of burglarizing the chicken house of Elga
Mills.    There was no material variance between the indict-
ment and the proof.

Under the fifth error complaint is made of certain evi-
dence admitted relative to the conduct or actions of the
seventeen chickens when they were returned to the feeding
pen succeeding the alleged crime.    The substance of the
evidence was, that when the chickens were placed in the
pen at night they went over to one side and began to eat;
that next day they walked up to the chicken house door,
which was closed, and tried to get in, and when the chicken
house door was opened on Wednesday evening the chickens
went inside, flew up on the self-feeder and then upon the
roost in the house.    Counsel for plaintiff in error contend
this evidence is inadmissible, being like that of the blood-
hound testimony in trailing a human being.    (*People* v.
*Pfanschmidt,* 262 Ill. 411.)    We think there is no analogy
between the two situations.    The evidence in the instant
case merely tends to show whether or not the chickens felt
at home, and we see no error in its presentation to the jury.

The sixth assignment of error involves the giving and
refusing of instructions.    There were thirty-four instruc-
tions given to the jury,—eighteen on behalf of the People,
and sixteen of the twenty-one submitted, for the defense.
Such a great number of instructions in a case of this char-
acter is entirely unnecessary.    The utility of instructions to
juries is to advise them concerning the rules of law ap-
plicable to the facts of each case, and their efficiency de-
pends upon the ability of the jury to make such application.
Thirteen of the eighteen instructions given on behalf of the
People are severely criticised by plaintiff in error.    We have
read all of the instructions given, and while there are some
inaccuracies therein, yet under the circumstances, there be-

ing two defendants on trial, we think as a series they sufficiently stated the law applicable to the case and no injury resulted therefrom to cause reversible error.

The last error argued, that the verdict is not supported by the evidence, requires little discussion. It has many times been held that where there is contradictory evidence it is for the jury to determine what witnesses are entitled to the greatest weight and credit. It is only when a reviewing court is satisfied, from a consideration of the entire record, that there is a reasonable doubt of the defendant's guilt that the verdict and judgment will be disturbed. The jury evidently believed the testimony of the State's witnesses and disbelieved the explanation related by plaintiff in error and his witnesses as to his ownership, possession and sale of the chickens. There is nothing inherently improbable or unreasonable in the belief adopted by the jury. The journey to Piatt Callahan's house and from there to Sidell for the purpose of selling the chickens, passing near by *en route* two or three other towns where chickens and poultry were bought and sold, and the sale of the chickens in Sidell to a person evidently not maintaining a regular poultry house and at a less price than another dealer in the same town was paying, was a rather unusual circumstance; also plaintiff in error's flight from the officers when the latter advised him of having a warrant for his arrest was a circumstance tending to cast suspicion upon his testimony. Taking into consideration all the facts and circumstances shown upon the trial, a reviewing court would not be warranted in reversing the judgment for the reason that it was not supported by the evidence.

The judgment of the trial court is therefore affirmed.

*Judgment affirmed.*