(No. 18366.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ULYSSES S. WOLF, Plaintiff in Error.

*Opinion filed February 20, 1929—Rehearing denied April 4, 1929.*

A. N. TOLLIVER, E. E. CALHOUN, and WARD & PUGH, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, CLARENCE T. SMITH, State's Attorney, and MERRILL F. WEHMHOFF, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Ulysses S. Wolf, was tried and convicted of arson by a jury in the circuit court of Clay county. Motions for a new trial and in arrest of judgment were

overruled. Judgment was entered on the verdict, and plaintiff in error was sentenced to serve an indeterminate term in the penitentiary. He has sued out this writ of error.

The first count of the indictment charges that Wolf on the 5th day of July, 1926, "unlawfully, feloniously, willfully and maliciously did set fire to and burn a certain barn of one Everett Steele." The second count charges that Wolf on said date "unlawfully and feloniously, willfully and maliciously, did set fire to and cause to be burned a certain building, to-wit, a barn of one Everett Steele." Plaintiff in error contends that the indictment is defective in that it does not allege that the barn burned was the property of Everett Steele or of anyone else. Section 19 of division 1 of the Criminal Code provides that in an indictment for arson, "if the building was occupied, it shall be sufficient to allege the building to be the property of the owner, lessee or occupant thereof; if unoccupied, to allege simply that such building was at such time unoccupied, giving a description thereof in general terms." One meaning of the word "of" given in Webster's New International Dictionary is, "belonging to." The plain meaning of the words "a barn of one Everett Steele," is that it is a barn belonging to or the property of Everett Steele. This is the view that has been adopted in other jurisdictions where the question has arisen. (5 Corpus Juris, 564.) The court did not err in overruling the motion to quash the indictment.

At the time the barn burned, Everett Steele lived about three miles north of Louisville, in Clay county, in a house located about one-half mile east of State hard-surfaced highway No. 25, which runs north and south. His house was located on the south side of a highway running east and west and intersecting with State highway No. 25. His barn was located about 75 feet east of his dwelling. On the north side of this highway running east and west, in a northeasterly direction from Steele's house and barn, was the dwelling house of plaintiff in error, Wolf. Wolf's house

was about 350 feet from Steele's house and about 250 feet from Steele's barn. East of Steele's barn about 20 feet there was a wire fence running north and south, and there was also a wire fence on the south side of the road opposite Wolf's residence. Steele's barn was about 30 by 32 feet in size, with stalls for four horses on the south side and for four cattle on the north side. There was also a corn-crib on the north side of the barn and a 10-foot driveway through the middle. Part of the barn had been built for twelve or fourteen years and part was six years old. It was insured for $250. Steele's house was insured for $500. He owned 37½ acres of land and there was a mortgage on it for $700. Steele was about thirty-eight years and Wolf about sixty-five years of age. They had lived in their respective dwelling houses for many years. There had been trouble between them, and about eighteen months before the barn burned Steele had given Wolf a flogging, and Wolf had had Steele arrested for assault and battery and disturbing the peace. They had not spoken to each other since that time. Steele left home with his family on July 3, 1926, to visit relatives in Urbana. He returned within about five days and on his return found that his barn had been destroyed by fire.

About one o'clock in the morning of July 5 John Galoway and his wife, Reuben Bateman, Roy Murray and Leona Householder were driving south on State highway No. 25, north of Louisville, in an automobile. They had been visiting in Mansfield, Illinois, and were returning to their homes in Olney, Illinois. When several miles north of Steele's place they saw the glow of a fire. Murray and Bateman were riding in the front seat and Galoway and his wife and Miss Householder were in the rear seat. As they slowed down at the intersection of the highway running by Steele's house with State highway No. 25, according to Bateman, a car passed them going north on the State highway. At this intersection Galoway and those with him

turned east and drove to a point about 100 feet west of Steele's dwelling house, where they stopped. Steele's barn was then burning and they saw fire in the dwelling house. They were the first to arrive at the scene of the fire. When they arrived there all of the barn except the large timbers were burned and shortly thereafter the rafters began falling. Galoway and Bateman got out of their car and went down the road to Wolf's house, where they saw Wolf in his yard. Wolf was fully dressed. According to Galoway he had on a hat, trousers and shoes and either a shirt or blouse. Bateman testified that he wore a hat, shoes, shirt and trousers. There was also a woman and a child there, who according to Bateman had on only their night clothes. Wolf was drawing water from a cistern east of his house. Bateman asked him if he knew who lived on the Steele place, and Wolf said, "No." In reply to another question he said there was no one at home there; that they had gone to Champaign. After this conversation Galoway immediately went back down the road to the fire. Sparks were then flying toward Wolf's house and he had placed a ladder against his house, up which he climbed to throw water on the roof. Bateman assisted him to draw some water and then went down the road to the Steele place. In going from their car to Wolf's house and in returning to Steele's place Galoway and Bateman walked directly down the traveled part of the road and at no time left the road.

As soon as his car stopped Murray got out and went to Steele's house. He knocked on the front door and tried to get in through a window. He then went around to the back door, which he found standing open. The house was full of smoke. Two other men then came up, and the three went into the house and found bedding against the west window, with a mattress and some chairs against it, and a straw bed up against the front door. These things were all on fire and the men drew water and put out the fire.

When Galoway returned from Wolf's premises to Steele's house he saw a feather bed laid up against the west window and a straw mattress against the front door. The pieces of bedding had furniture piled against them, and according to his testimony they were on fire, as was the carpet or rug on the floor. Four or five other persons had arrived and Galoway assisted in putting out the fire. When Bateman arrived at Steele's house from Wolf's premises the fire was about out. He saw bedding "poked in the west window and north door," which had been on fire and was smouldering. The house was full of smoke and the carpet on the floor around the north door was scorched. After Bateman saw the fire in Steele's house was under control he went outside and saw Wolf at a well west of his house, where he was getting water. Bateman went over there and talked with him. When reminded that he had said he did not know who lived in Steele's house, Wolf said, "Yes, I know who lives in that house; I do not know what led me to make that kind of statement." Wolf stated he had been away from home that day at a saw-mill. Bateman remarked that the condition indicated that the fires on Steele's place had been purposely set, and Wolf said, "Do you think so?" When the condition of things in the house was described he remarked that it did look rather suspicious.

Mrs. Galoway and Miss Householder did not get out of the car. They both testified that at the time their car stopped they saw a man on the east side of Wolf's house carrying a ladder to the house from a garage or barn east of the house. They stated that while they were there in the car other people came up, some of them buttoning their clothes as they came.

Edward Cogswell, the sheriff, arrived at Steele's premises about daylight on the morning of the fire. His deputy, Audley Jackson, arrived there about three o'clock. Both of them testified that when they got to Steele's house there was a feather bed propped against the west window, a rock-

ing chair and a straw-tick almost consumed by fire were lying on the floor, and a chair was in front of the front door. The glass in the front door was cracked and the scuttle-hole in the ceiling near the door was open, the lid having been raised. These men went over to Wolf's place and told him they were investigating the fire. He said he knew nothing about it; that he was in bed, asleep, and would have burned up if some men whom he did not know and who said they were from Champaign had not woke him. Wolf appeared to be very nervous. His voice trembled and he walked about as he·talked.

Jackson, the deputy sheriff, testified that from Wolf's place he went back to Steele's house, where he met Charles Kanatzer, from St. Elmo, and he and Kanatzer went out back of Steele's barn about 20 feet to a wire fence and found a place where the wire had been mashed down, and the marks showed that somebody had gone over the fence. They followed these prints in the grass and dew to a post south of the well and then directly north to the wire fence across the road and south of Wolf's house, and there was some buck brush in the fence and the brush showed it had been disturbed. The wire there was mashed down, and from this brush a man's tracks led across the road a little bit northeast to a point between the public highway and the driveway at Wolf's house. There the ground was so hard they could not tell which way the tracks went from that point. The tracks were made by a shoe with a narrow last, and looked to be about a No. 7. He stated that he made a comparison of the tracks they followed with others around Wolf's place that were made by Wolf. He said the tracks which he knew to be Wolf's tracks were made by a narrow shoe, size about No. 7. He also saw tracks in the road west of those he followed from Steele's place, but those tracks were made by people walking angling across the road, more in an east and west than a north and south direction, and were of various sizes. On cross-examination

he stated that he never measured any of the tracks but put a circle around them; that he could not say he could tell the size of a shoe that makes a track; that he might be mistaken when he said the tracks were made by a No. 7 shoe, and that he did not know the length of a No. 7 shoe.

Kanatzer testified for the People that he operated a detective agency in St. Elmo. He was called by the sheriff and arrived at Steele's premises about daylight. In Steele's dwelling he found bedding against the west window and front door that had been on fire. He looked at the tracks about the premises. East of the barn he found where the fence had been pressed down and someone had climbed over it. From this place he followed tracks in the grass and dew leading in a northeasterly direction. The tracks were located by dirt left on the dewy grass by shoes. This witness said: "Following the tracks up the incline you could distinguish something had gone through it. Couldn't tell whether it was a hog, a cow or a horse, but about one-half way up we could tell it was shoe tracks, and at the fence the wire was pushed down, and you could tell from the print made at the fence row that shoes had made those where they had stepped on the buck brush and pushed them apart, and from there just about two of the steps were made and they stepped out in the road. The first two tracks you couldn't get a measurement but the next possibly three steps as I found them I put a mark around them. I cut a stick and with it measured the length and breadth across the ball of the foot. I measured the heel both ways. I couldn't tell whether it was a rubber heel or not The tracks went into where the little grass plot was in front of the yard at Wolf's house." Witness went to the Wolf premises and asked Wolf if there were any strangers there during the night, to which Wolf replied "Yes." Witness then asked if any of them had been across the pasture, and Wolf replied, "I haven't, and I really don't know whether they were or not." He said that he had not been over to the

fire but that the strangers had; that if the strangers had not woke him up his house would have burned down on him, and there were great sparks and shingles blowing his way and alighting on his roof. Witness measured some tracks that Wolf had made and found they corresponded in size exactly with the tracks he measured in the road. Wolf appeared very nervous and walked back and forth, part of the time with his hat on and part of the time with it off. On cross-examination witness said he did not take any measurements of tracks by the foot or inch and could not tell the size in inches of any of them. He kept the stick with which he measured the tracks in his car for some time but did not know what became of it. There were a good many tracks in the highway leading in all directions and there was nothing uncommon about any of those tracks.

Plaintiff in error did not testify and there is no conflict in the testimony as above set forth. To all of the evidence concerning the fire in Steele's dwelling house and the condition of its contents plaintiff in error objected. He contends that the court erred in overruling his objections. The purpose of this evidence was to show that the burning of the barn was caused by human agency, or, in other words, that the fire was of incendiary origin. The fire in the house and the fire in the barn occurred at the same time. The conditions in the house were such as to indicate clearly that the fire there was of an incendiary nature, and therefore also tended to prove that the barn had been set on fire. The rule as stated in 16 Corpus Juris at page 594 is, that evidence of other fires is admissible when it tends to show that they, with the fire in question, were part of one connected scheme or purpose of defendant, or when it tends to show that the fire in question was of incendiary origin. In *State* v. *Thompson,* 97 N. C. 496, 1 S. E. 921, where the charge was setting fire to an outhouse, evidence that on the same night when the outhouse was burned there was an attempt to burn the dwelling by means of faggots of

wood tied with a rope belonging to defendant, the house being some fifteen yards from the outhouse, was held properly admitted. In *People* v. *Jones,* 123 Cal. 65, 55 Pac. 698, the charge was the burning of a dwelling house. On the same 40-acre lot with the dwelling house, a barn from 100 to 150 feet away, a granary from 40 to 60 feet away and a chicken coop from 45 to 65 feet away also burned. Evidence of these separate fires was held properly admitted in proof of the *corpus delicti.* The rule as above stated in Corpus Juris is also supported by *State* v. *Cox,* 264 Mo. 408, 175 S. W. 50, and *Shuffield* v. *State,* 120 Ark. 458, 179 S. W. 650. In *People* v. *Harris,* 263 Ill. 406, counsel for the State was permitted to cross-examine the defendants, who were charged with arson, concerning other fires about which the defendants were supposed to have had some knowledge or interest, and about one fire in particular. This court said: "That fire was not in any way connected with the one in this case but it concerned one of the plaintiffs in error, and it was not improper to inquire of him in regard to that fire, as the occurrence of a number of fires on the property of the same person would have a tendency to rebut the theory that they were accidental. Where the same person has a series of fires and collects insurance, it furnishes a basis for an inference, of more or less strength, that the fires were not accidental." In arson cases, proof of the *corpus delicti* consists not alone in establishing the burning of a building but must also include proof that the fire was started willfully by some responsible person. *Carlton* v. *People,* 150 Ill. 181.

The evidence objected to was pertinent on the question of the fire in the barn having been started by human agency; and was therefore properly admitted.

It is also urged that the court erred in allowing evidence of statements made by plaintiff in error to be introduced before the *corpus delicti* was proved. It is true that proof of the *corpus delicti* must be made by evidence inde-

pendent of admissions by or confessions of the defendant, (*Bartley* v. *People*, 156 Ill. 234; *Andrews* v. *People*, 117 id. 195;) but it is also true that proof of the *corpus delicti* may be made by circumstantial evidence. (*People* v. *See*, 258 Ill. 152.) The order in which evidence is to be received is largely within the discretion of the trial court, (5 Corpus Juris, 583,) and no error was committed in that respect in this case.

When Steele testified concerning the trouble between himself and Wolf he said, "I gave him a whipping, and he had me arrested for assault and battery and disturbing the peace, and I beat him in both cases." When Cogswell, the ex-sheriff, was testifying and was asked about the trouble, he said: "There was a warrant sworn out for Wolf and placed in my hands—I meant for Mr. Steele and placed in my hands. I arrested him. He gave bond. We had a trial here and Mr. Steele came clear." On motion this testimony of Cogswell was stricken and the jury instructed to disregard it. No motion was made to strike the statement of Steele above set forth, but the question that brought it forth was objected to and the objection overruled. It is contended that the court erred in allowing the evidence of the outcome of the cases in which Steele was charged with assault and battery and disturbing the peace to go to the jury. It is always proper in a criminal case to prove motive. (*People* v. *Looney*, 324 Ill. 375.) The evidence of ill-feeling, unfriendly relations and trouble between plaintiff in error and Steele was proper for this purpose and also as tending to show malice on the part of plaintiff in error toward Steele. Proof of the outcome of the cases in which Wolfe had charged Steele with assault and battery and disturbing the peace added nothing to the evidence in that respect. The court struck out Cogswell's evidence on that point and instructed the jury to disregard it. Had the motion been made the court would, doubtless, have stricken that part of Steele's testimony referring to the outcome of

those trials. We do not see how plaintiff in error was prejudiced by this evidence and do not regard its presence in the record as constituting reversible error.

In his testimony Kanatzer stated that when he had followed the trail from the barn across the pasture to Wolf's place he asked Wolf if he might come in. Wolf asked him to come in and he went into the yard. Wolf asked him what kind of dogs were the ones he had, and witness replied, "Blood-hounds." Wolf then said that they were mighty nice dogs. No objection was made to this evidence and no motion was made to strike it, and yet plaintiff in error contends the judgment should be reversed because this reference to blood-hounds appears in the evidence of the witness. The law is, as stated by plaintiff in error and as laid down in *People* v. *Pfanschmidt,* 262 Ill. 411, that testimony of the trailing of either man or animal by a blood-hound should never be admitted in evidence in any case. There is nothing in this case that violates that principle. Here the only reference to blood-hounds is the one above mentioned. There is no evidence or offer of evidence that they followed any trail.

Plaintiff in error objected to Jackson and Kanatzer testifying because their names were not indorsed on the indictment. After the State's attorney had furnished counsel for plaintiff in error with a statement of what he expected to prove by each of these witnesses the court allowed them to testify. It is within the discretion of the court to allow witnesses whose names are not indorsed on the back of the indictment to testify, and the exercise of that discretion will not be reviewed unless it appears that the defendant has been taken by surprise. *People* v. *Weil,* 243 Ill. 208; *People* v. *Williams,* 240 id. 633.

It is urged by plaintiff in error that the court erred in giving to the jury, for the People, improper and erroneous instructions, in refusing to give proper instructions offered by the defendant, and in modifying certain instruc-

tions offered by him. We have read all the instructions given by the court to the jury, including the instructions offered by the defendant and modified by the court, and also the instructions offered by the defendant which the court refused to give to the jury. The record discloses no prejudicial error with reference to the giving, modifying or refusing instructions, as above contended.

Plaintiff in error also contends that the judgment should be reversed on the facts. In this connection it is urged that there is not sufficient proof of the *corpus delicti.* The proof in that regard is certainly as strong and satisfactory in this case as was the proof in the cases of *Carlton* v. *People, supra,* and *People* v. *Hannibal,* 259 Ill. 512, where judgments of conviction for the crime of arson were affirmed. In *People* v. *Callahan,* 324 Ill. 101, this court said: "Often the facts and circumstances from which the *corpus delicti* is proved are those which connect the accused with the commission of the offense. There is no invariable rule as to the quantum of proof necessary to establish the *corpus delicti.* Each case must depend, in a measure, upon its own particular circumstances." It is seldom that the crime of arson can be established by direct and positive testimony of witnesses who actually saw the fire set. The inference of guilt must be drawn in most cases from circumstances satisfactorily proved. A court of review should not disturb the verdict of a jury unless the verdict appears to have been the result of passion or prejudice or unless the evidence is so unreasonable, improbable or unsatisfactory as to warrant a reasonable doubt of guilt. (*People* v. *Hicketts,* 324 Ill. 170.) After an examination of the record in this case we are satisfied that the verdict is supported by the evidence and that there is no reasonable doubt of defendant's guilt.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*