### STATE v. WENGER

(No. 1873; December 11, 1934; 38 Pac. (2d) 339)

402

For the appellant there was a brief by *D. R. Higley,* of Rawlins.

For the respondent, there was a brief by *Ray E. Lee,* Attorney General; *O. O. Natwick,* Deputy Attorney General, and *Wm. C. Snow,* Assistant Attorney General, all of Cheyenne.

BLUME, Justice.

Jacob W. Wenger, the defendant, was convicted of the crime of arson, and from the sentence imposed upon him he appeals. The main contention made is that the evidence in the case is insufficient to sustain the conviction herein. The record discloses, in outline, the following:

The defendant and Ned F. Steel were neighbors in Carbon County in this state, both owning a farm. The latter, in the fall of 1931, desired to go to St. Joseph, Missouri, in order to engage in selling school supplies for a firm in Kansas City. He accordingly entered into a written agreement with the defendant whereby the latter undertook to take care of Steel's ranch, the buildings, chickens and the live stock thereon, until Steel's return. The defendant further agreed that he would do some plowing for Steel, and that he would not, with some exceptions, sell any of the grain on the place without payment therefor in cash which was to be turned over to Steel. The latter went away as he had planned, leaving on his place a large amount of grain —some 726 bushels of oats, 500 bushels of wheat, and 400 bushels of rye. Defendant moved into Steel's house with his personal belongings. During the winter some correspondence took place between him and Steel, whereby the latter was informed that defendant had sold some of the grain without accounting therefor. Steel, in answering, referred to the fact that defendant

might be guilty of embezzlement, but stated that they would adjust the matter upon his return. He returned during the early part of June, 1932, and several times demanded an accounting from defendant and payment of what was due him, finding, according to his testimony, that the defendant had, during the winter, disposed of substantially all of the grain which had been left on the place. That fact is disputed by defendant to some extent, but he admitted that he had sold grain of the value of over $200, for which he had not, but should have, accounted to Steel. He claims that he left his account book in the room where he slept, informing Steel that he might examine it to find out to whom he had sold the grain, and the amount thereof. But Steel testified that he was unable to find out anything from defendant; that the latter acted surly and overbearing. More or less trouble arose between the parties, probably on account of the sale of the grain, Steel testifying that on June 16, 1932, he was attacked by defendant with a knife. This was denied by defendant. The arson, if committed, took place on the night of July 3rd and 4th, 1932, at about one o'clock during that night, by burning down Steel's barn. About supper time on the 3rd, a man by the name of Elmes, a neighbor, came over to Steel's place. Steel and the defendant were both present, the latter still living there. Elmes and the defendant apparently had some accounts to adjust between them, and the former came over with that object in view. But, according to his testimony, he was unable to get the defendant to produce his books, and that he acted surly. A fight between them, explained differently by the witnesses, ensued. During it Steel telephoned for Daugherty, a deputy sheriff. The latter, together with Jessmer, his assistant, arrived at Steel's place about 10:30 o'clock p. m., but would not make any arrest in view of the fact that the fight had not taken place in his presence. Steel offered to go

before a justice of the peace and swear out a warrant against Wenger for disturbing the peace. He further told defendant that they would settle their differences in the office of the prosecuting attorney, and he also wrote out and gave to defendant a notice to quit his premises within twenty-four hours. With that as the situation, Steel and Elmes left in the former's automobile, which was taken out of the garage, a part of the barn. Daugherty, the deputy sheriff, and his assistant, started away about the same time, leaving the defendant alone at Steel's place. That was about 15 minutes before midnight. Steel and Elmes, instead of going directly to a justice of the peace, as they had intended, changed their plans and went to Elmes' house. But before going to sleep, they discovered that Steel's barn was on fire. That was about one o'clock of the morning of July 4th. Again the deputy sheriff was called. He, together with Jessmer, his assistant, arrived at Steel's place about 3 o'clock in the morning, pounded on the house at the north side, but no one answered, although, as the witness Jessmer testified, the knocking was loud enough to awaken anyone in the house. Defendant claimed that he did not awaken because he had not slept to any extent during the previous night. After seeing Steel and Elmes, and finding out that defendant slept in a room on the west side of the house, the deputy sheriff and his assistant returned to Steel's place and again pounded on the house, calling for defendant. In a few minutes the latter appeared, only partially dressed. He was placed under arrest, and a gun was found on the pillow of his bed. Some of the testimony of the deputy sheriff as to defendant's demeanor at that time is as follows:

"Q. How was he dressed? A. He had on overalls and shirt and socks. Q. What conversation followed after you got in? A. I asked Mr. Wenger what had happened there, and he said 'nothing,' and I asked him what had happened to the barn, and he said 'What

barn?' and I said 'Ned's barn,' and he looked around—he had his back to the south window in the house, and he said 'It's gone, isn't it?' Q. What else did he say, if anything? A. I believe that's all he said right then. Q. Did he express any feeling with regard to the destruction of the barn? A. No sir. Q. What was his action? A. Nothing out of the ordinary. He just stood there. Q. In no way excited? A. No sir. * * * * Q. Did Mr. Wenger ask you why you had come up there? A. No. sir. Q. Did you place him under arrest? A. Yes sir. Q. Did he ask you why? A. No sir. * * * * Q. What time did you start for Dixon? A. About four o'clock. Q. And you had Mr. Wenger with you? A. Yes sir. Q. Did you carry on any conversation with him going down there? A. A little. Q. What did he say—what remarks did Mr. Wenger make about this case? A. I think he remarked about some things that he had lost in the fire. Q. Do you recall what he said? A. He said he lost six sets of harness and a wagon and a rack. Q. What else did he say? A. He said he supposed that Mr. Steel would charge him with burning the barn, along with the other charge. * * * Q. Was he calm? A. Yes sir. * * * Q. When Mr. Wenger let you in the back door that morning on your second call, what was Mr. Wenger's appearance, his facial expression or appearance? A. Nothing unusual—he just looked natural to me. Q. Did he look or did he act sleepy? A. No sir."

According to the testimony of most of the witnesses, the night of July 3rd to 4th was calm, but dark. There was no lightning. Elmes and Steel and the deputy sheriff saw no fire at the place when they left shortly before midnight. Nor did the defendant. According to the testimony of a neighbor, who traveled along the public road about 200-300 feet from the barn, at about midnight, there was no fire at Steel's place at that time. Other witnesses met no one along the road about that time who might have gone to Steel's place. The deputy sheriff found no tracks of any one who might have burned the barn. There was a forge near the southeast corner of the barn which had been used

about five o'clock on the afternoon of July 3rd, but the fire had been put out with a bucket of water. The testimony shows that the east side of the barn was still burning, while the west side had been reduced to nothing but burning coals. The nearest point of the house, where defendant slept, was about 75 feet from the barn, and toward the northwest. Not even the poles of a corral which stood close to the barn on the west were burned. The testimony further shows that defendant had a conversation with the witness Conners in March, 1932, in which the defendant told the witness that he had received a letter from Steel; that the latter would prosecute him, the defendant, for stealing the grain, and "if he does, I burn the s. o. b. out." This was denied by the defendant, who further claimed that he lost property in the fire worth about $500. That he lost some property is undoubted; the value of it, however, is greatly in dispute. The barn which was burned was valued from $500 to $4,000. There was no insurance on it, of which, according to Steel, the defendant had knowledge. Other facts will be mentioned later.

In arson, as in other criminal cases, it is necessary to prove the *corpus delicti* and the identity of the prisoner. 5 C. J. 570-571; 2 R. C. L. 515. The *corpus delicti* is not shown by the mere proof of the burning, but it is necessary for the state to show that the burning was of incendiary and criminal origin and not accidental, and the presumption is that it was accidental. 3 C. J. 571; 2 R. C. L. 515-516. So it has frequently been necessary for appellate courts to reverse convictions in arson cases on account of the fact that the two elements of the *corpus delicti* were not sufficiently shown. Still, it is recognized by the courts that the crime of arson can seldom be established by direct and positive testimony of witnesses who actually saw the fire set. People v. Wolfe, 334 Ill. 218, 165 N. E. 619. Thus it

was said in the case of Wade v. State, 16 Ga. App. 163, 167, 84 S. E. 593, 595:

"It is not often possible to make out a case of arson by direct proof establishing the *corpus delicti* or showing the connection of the defendant with the commission of the crime, for arson is seldom committed except at an hour when there is small chance that the criminal will be actually observed in the execution of his nefarious purpose, and it is also easy to commit the crime by stealth, without the help of an accomplice, without the beating of drums, or any betraying noises; and therefore circumstances must generally be depended upon not only to show the guilt of the accused, but to establish the *corpus delicti*."

The facts and circumstances which tend to prove the *corpus delicti* are often interwoven and considered with those which connect the accused with the crime. 5 C. J. 580; People v. Callahan, 324 Ill. 101, 154 N. E. 463; People v. Wolfe, supra. In State v. Millmeier, 102 Ia. 692, 72 N. W. 275, 277, the court said:

"In this case the burning of the barn is established by direct evidence, but there is no proof of other than circumstantial that it was feloniously set on fire. The circumstances relied upon to prove that it was wilfully and maliciously burned, are as a rule those which tend to connect the defendant with the commission of the crime. That such circumstances may be considered in proving the *corpus delicti* seems to be well settled. Carlton v. People, 130 Ill. 181, 37 N. E. 244 (41 Am. St. Rep. 346)."

And in the case of Sawyers v. Comm. 88 Va. 356, 359, 13 S. E. 708, it was said that among the chief *indicia* which go to substantiate at once the *corpus delicti* and the guilt of the prisoner in a case of arson, are the circumstances that the fire broke out suddenly in an uninhabited house and that the accused had a case of ill will at the sufferer or had been heard to threaten him. And in State v. Millmeier, supra, the court appears to have considered the fact that the fire

broke out suddenly in an uninhabited place to be of importance in establishing the *corpus delicti.*

Turning then to the facts in the case, the fire, if the state's evidence is to be believed, broke out in an uninhabited building, and that within an hour after none had been observed. This may well be characterized as suddenly. It is the defendant's theory that it might have been caused by the fire from the forge at the southeast corner of the barn. But the state's evidence shows that that fire was extinguished at five o'clock of July 3rd by a bucket of water. That was eight hours before the barn was burned. No fire was observed up to about midnight, as shown by a number of witnesses. The defendant himself testified that he neither saw nor smelled any fire or smoke at the time when Steel and the others left, and the jury evidently concluded, and we think justifiably, that if the manure had been set afire in accordance with the theory of the defendant, its effects would have been noticeable in some way by midnight. Moreover, the west end of the barn was burned down to coals when the east end was still in flames, indicating, in the absence of explanation, that the fire started at the west, and not at the east where the forge was located. That fact might, of course, be explained otherwise, if the west end of the barn contained material more inflammable than the material located in the east end. But the defendant makes no such claim, and he knew as well as the witnesses for the state just what was in the barn. The defendant further testified that there was some backfiring when Steel's automobile was taken out of the barn. But he further stated that he did not see anything in the barn catch fire. And the witness Daugherty testified that he saw nothing unusual when the automobile was started, and noticed no fire. Neither Steel, who took out the car, nor Elmes, who was with him, smoked. There was, as stated before, no lightning that night. Nor does

anything else appear in the record which would indicate that the fire might have been accidental. These facts, at least when taken in connection with the other evidence in the case, is, we think, sufficient to justify the jury in finding that the burning of the barn was of incendiary origin.

The evidence tending to show the defendant's connection with the arson, too, was wholly circumstantial, and it is insisted that it was not sufficient to show that he is guilty of the crime with which he is charged. It is true, as claimed, and as charged by the trial court, that the evidence to convict the defendant herein must be sufficient to show, to the exclusion of every other reasonable hypothesis, that he is the guilty person. But the determination of that fact is primarily for the jury. Counsel seems to be under the impression that this court must likewise be able to say that, even though we have but the cold record before us. But that is not so. True, this court is the ultimate tribunal to say whether or not the facts shown in the case are legally sufficient to satisfy the criterion of law applied in such cases. And that is sometimes a delicate task. It is at times difficult to either answer in the affirmative or the negative. It has not been easy in the case at bar. But mindful as we are, and as we must be, that a defendant should not be convicted unless he is guilty beyond a reasonable doubt, still we must also be mindful of the rights and security of society. Nor must we forget that the constitution and the laws have granted the primary right to determine the facts to the jury. And simply because this court cannot definitely determine, from the cold record before it, that the defendant is guilty beyond a reasonable doubt, does not necessarily give it the right to set the verdict of the jury aside. Thus it was said in Adams v. State, 149 Ark. 669, 235 S. W. 372, 373:

"It may be true, as appellant insists, that this fire was accidental; but the testimony set out above was legally sufficient to support the finding to the contrary. It may also be true, as insisted by appellant, that he was not responsible for the origin of the fire; but we cannot say that only that inference can be legally drawn from the testimony, and as it is our province only to pass upon the legal sufficiency of the testimony, we conclude our discussion by saying that it is legally sufficient to support the jury's verdict."

In the case of State v. Pothakos, 170 Minn. 401, 212 N. W. 598, an arson case, the court commented at length on the unsatisfactory state of the evidence on a number of points in the case, but concluded by affirming the verdict of guilty. In the case of Williams v. State, 21 Okl. 161, 205 Pac. 772, 773, also an arson case, and much weaker in its circumstances than the case at bar, the court said:

"In view of the fact that the conviction rests almost wholly upon circumstantial evidence, from the facts recited in the record, without having the privilege of seeing the witnesses or observing their demeanor on the witness stand, we would hesitate to pronounce the defendant guilty. But ordinarily the jury are the sole triers of the facts, and where, as in this case, the evidence is largely circumstantial and conflicting, this court will not disturb the verdict of the jury unless the evidence points to the guilt of another or is so inadequate as to shock the conscience and common sense of the appellate court, indicating a manifest miscarriage of justice."

See further on this subject the following arson cases: People v. Saunders, 13 Cal. App. 743, 110 Pac. 825; People v. Patello, 125 Cal. App. 480, 13 P. (2d) 1068; State v. Despain, 152 Wash. 488, 278 Pac. 173, 174; People v. Vozel, 346 Ill. 209, 178 N. E. 473; Alsept v. Comm., (Ky.) 42 S. W. (2d) 517; Williams v. State, 90 Ind. App. 667, 169 N. E. 698. In the latter case it was said:

"It is the law that an appellate tribunal will not disturb the verdict of the jury when the evidence is circumstantial and of such character that two conflicting inferences may be reasonably drawn by the jury, one favorable to or tending to prove the guilt of the accused and the other favorable to his innocence."

In the case at bar, no tracks connecting another with the burning of the barn were found. At midnight no one was seen along the road leading past the premises of Steel. It does not appear that a third party had any motive in setting the fire. These facts, in the light of the opportunity which the defendant had to commit the crime in question, and in the light of the fact that the fire occurred in an hour after midnight, tended at least to some extent to connect the defendant with the fire. The ill will of defendant toward Steel, which, as held in Sawyers v. Comm., supra, is one of the chief *indicia* to substantiate defendant's guilt, was, we think, sufficiently shown, although counsel for defendant attempt to minimize the importance of the various transactions which seem to indicate such ill will. Steel claimed that defendant was dangerous and revengeful. If his testimony relating to the attack on him with a knife, and other facts shown, are to be credited, we cannot say that the jury were wrong in concluding that this was true. The fact that defendant had a gun with him in his bed, on the night of the fire, when he had not had it on previous nights, perhaps indicated to the jury the same thing. The testimony of the witness Conners to the effect that the defendant told him that he would burn Steel out, in a certain event, was, of course, damaging. The witness had had difficulties with defendant, and defendant testified that Conners at one time virtually contradicted himself. But whether the testimony of Conners was true or not was a matter for the jury. The defendant slept in a room only about 75 feet away from the barn. The outside of the barn was constructed of galvanized iron, and must have

made considerable noise when it fell. Yet the defendant claimed that he heard no noise. He slept close to the door which led into another room in which there was a telephone, about 16 feet away. This telephone would ring whenever any one on the line would use it, and it was used soon after one o'clock. Yet the defendant claimed that he did not hear it. He further claimed that he did not hear the deputy sheriff knocking at the door of the house, the first time the latter arrived after the fire. He claimed that he slept so soundly, because he had had very little sleep the previous night. Jessmer, however, testified that the knocking on the door was loud enough for any one to hear, and there is further testimony to the effect that when the defendant came to let the deputy sheriff and his assistant in, he did not appear to be sleepy. If the defendant heard the falling of the material of the barn, and heard the knocking at the door as above mentioned, without getting up, it shows a consciousness of guilt and conduct wholly inconsistent with innocence. And we cannot say that the jury were not justified in finding these facts against the defendant. Moreover, the defendant must have realized that suspicion that he had committed arson would naturally arise under the circumstances. Yet the testimony indicates that when he was told that the barn was burned, he displayed no feeling, and merely stated "It's gone, isn't it." Nor was he surprised that he was arrested. It was for the jury to say as to whether or not that was the natural conduct of an innocent man under the circumstances. The fact that defendant had some property in the barn which was burned, had, of course, a tendency to show that he was innocent. But it is only one of the circumstances in the case. He may have left the property in the barn for the specific purpose of overcoming any suspicion that he set the fire, and his natural feelings toward his own property may have been overcome by his anger or

desire for revenge. We need not discuss the evidence in further detail. We have considered it with a great deal of care. It shows, if we may credit that of the state, not only an opportunity to commit the crime, but also a motive and a disposition to commit it. The credibility of the testimony was for the jury. They saw the witness. They observed the demeanor of the defendant on the witness stand. We are not in the same position, and do not have the advantages which they had. We think we are constrained to hold that the evidence in the case was legally sufficient to authorize the jury to convict the defendant.

2. Counsel for the defendant also complains of the fact that the court failed to instruct the jury that opportunity to commit a crime is not sufficient to justify a conviction. No special instruction on that subject was asked by defendant, and still his counsel believes that under the circumstances of the case the court should have given such an instruction on its own motion. He cites us to no case on the point. We think that counsel has laid too much stress on such an instruction. This is not a case, as we have already pointed out, in which the evidence consists merely or mainly of opportunity to commit the crime. That is only one of the facts shown. The court gave general instructions on circumstantial evidence. The jury were told, among other things, that "if the circumstances, no matter how strong, can be reasonably reconciled with the theory that some other person may have done the act, or that the fire which destroyed the barn may have resulted from some cause other than the intentional burning by the defendant, then you should acquit the defendant." No complaint is made of the instructions given. So far as they went, they seem to present the law governing the case correctly and fairly completely. And it is a general rule that in such case the defendant cannot, in the absence of a request, complain

that the court failed to call attention to a particular phase of the case. 16 C. J. 1059; Phillips v. State, 190 Ind. 159, 129 N. E. 466; State v. Geier, 184 Ia. 874, 167 N. W. 186; State v. Wood, 118 Kans. 58, 233 Pac. 1029; Brantley v. State, 9 Wyo. 102, 61 Pac. 139; Long v. State, 15 Wyo. 262, 88 Pac. 617. In State v. Rudman, (Mo.) 37 S. W. (2) 409, the defendant asked an instruction to the effect that though Rudman had opportunity and motive to set the fire and burn the building mentioned in the indictment, that of itself would not justify a verdict of guilty, unless in fact the jury should find that Rudman did set the fire. The trial court refused to give the instruction so asked. The Supreme Court, upholding that action, said:

"Instructions of this character have usually been condemned by this court as comments upon the evidence. * * * * Appellants cited cases such as State v. Ruckman, 253 Mo. 487, 101 S. W. 705, where it was held that evidence of motive was admissible, but that such evidence alone was not sufficient to make out a *prima facie* case. That ruling does not mean that the jury should be instructed in a manner emphasizing the effect of such evidence."

Of course, if it is not necessary to give an instruction on the subject under consideration when one is requested, it cannot be error not to give it in the absence of a request. We need not, however, decide whether such instruction should be given when requested, but enough has been said, we think, to show that it is not error not to give it in the absence of a request.

The judgment of the trial court must, accordingly, be affirmed, and it is so ordered.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.