32307, 32308, 32309. GRIMES *v.* THE STATE (Three cases).

DECIDED MAY 12, 1949. REHEARING DENIED JUNE 29, 1949.

*Daniel Duke, Frank A. Bowers, A. T. Walden,* for plaintiff in error.

*D. M. Pollock, Solicitor-General,* contra.

MacINTYRE, P. J. The defendant, Isaiah Grimes, was charged in three separate indictments with arson. With his consent all three cases were tried together. He was found guilty of each of the offenses charged. He made a motion for a new trial in each case which was overruled and he excepted. As numbered in this court, the cases are identified as No. 32307, for the alleged burning of the Mt. Zion Methodist Church on August 22, 1947; No. 32308, for the alleged burning of the Friendship Baptist Church on October 3, 1947; and, No. 32309, for the alleged burning of

the Loganville Colored School Building on November 21, 1947. The grounds of the motions for a new trial and the briefs of evidence are identical and the cases will be considered together by this court.

1. The verdicts of the jury were evidently based upon the confession made by the defendant and corroborated by other circumstances: "A confession alone, uncorroborated by any other evidence, shall not justify a conviction." Code, § 38-420. However, "a conviction may be lawfully had upon a free and voluntary confession though the same be not otherwise corroborated than by proof of the corpus delicti." *Wimberly* v. *State,* 105 *Ga.* 188 (1) (31 S. E. 162). In the instant case the defendant's written confession was as follows: "I, Isaiah Grimes, in the presence of C. J. Sorrells, the Solicitor-General, Mr. D. M. Pollock and Mr. P. W. Martin, the court reporter, make this statement. Fluke Catlin died and he had some insurance with two lodges, one was the Faith Hope & Charity and the other Joy & Benevolence, or Joy something, I don't know what the rest of it is; he had $80 insurance in one and with the other one had had $100 willed to a little girl, Minnie Idonia, an adopted girl. Fluke died. When Fluke died they would not pay the insurance to Maggie because he had made the insurance to the little girl. She wanted the money because he left some debt and these parties were bearing down on her for the money and she didn't have no way to get the money, and Maggie got mad about not letting her have the money and I didn't feel like they were treating her right. As to what I decided to do about that, I was crazy and thought I would get even with them and I didn't have any cause at all. They were meeting in Mount Zion Church, both of them, they had a church for each one. I could not tell you which one was meeting at Zion, one met in one place and one in the other. What I did then was I got crazy and thought I would get even with them and set it on fire. As to what I did that night, I had some old gas I had had a month in a tin can, it was an old five-gallon square can. As to whether I did anything to that, I got that tin can and cut the top out and made a slop bucket out of it and put a brace around the can, iron braces. That was after the second fire I did that. It was the same can. I found the can and took the can and had to get some gas. I got the gas from

W. I. Still who runs a filling station. I had gotten four or five gallons of gas and had about two gallons left. I got that gas the latter part of March and set it in the smoke house. The first fire was Friendship, I mean Mount Zion church. As to what time of night that was, I was on a fishing trip by myself and had been fishing and came back home. As to whether I had been drinking I might have had a little but not much. I got home that night about twelve or one o'clock and I went on in the house and then I got the can with the gasoline in it. I then went down to Zion. The way I went was through the back yard to a lady named Tuck's house. I crossed the Conyers road about the Tuck house on a little road where you go out through a little path where the sawmills sets. When I got to the church I took the gasoline and dashed the gasoline up in the front and set a match to it. Then I left and went back home the same way I came. I took the can with me. I did not use all the gasoline; there was somewhere around three quarts or a half a gallon left. As to what I did when I got home, I set the can in a little old house at Fluke's house. At Fluke's house is where Maggie lived. That was on the 22nd of August. At the time the second fire happened and Friendship Church was burned, I was down at my uncle's, Alfred Grimes'. We were playing Florida String down there. At the game was me, Isaiah Grimes, Pearly Grimes, Eliza May Baker, Annie Rice Martin, Frank Hill, William Hill, Joe Cox, Joe Wood and I think that is all. Maggie had left there before that time; Maggie Catlin had been there and left. As to how that fire happened, I had no cause. They were playing Florida String, "rise and fly". By rise and fly when one of the crowd get beat they had to quit and when they get beat two others got up, the best two out of three. Me and Alfred Grimes played and he and I had to rise and fly. When I rose I went back and walked out this front door and got the gas and went to Friendship Church. In order to get to Friendship Church I had to pass Fluke Catlin's house where I had left the gas. I went to the back and got the can and there were three quarts in it, might have been more. I then went to Friendship Church and threw it on the front and struck a match to it and left. I then brought the can to the house and in a day or two took some hooks and cut the top out and had some steel hooks and put a

handle on it. That is the one you have in the office at Monroe, that is the one. Friendship Church is a short distance from where the game was; it ain't nothing like a quarter of a mile, something like two hundred and fifty or three hundred yards. I then came back and went to playing and played two hands with William Hill and Joe Wood. Joe Wood is the one who discovered the fire. What he said was 'something is burning up there.' When I went out the front door nobody said anything about me going out. When I came back somebody asked me where I had been, some one in the crowd I don't know which one. I had been gone then about twenty-five or thirty minutes. That was the second one. About burning the schoolhouse: I went and fed the hogs and came back by my mother's. That was at Fluke's house; I went in the house and walked off and said I was going off. I then went back and got a jug; it was a gallon jug with two handles, one on each side. I then went by Uncle Alfred's. I went in there and sat down a while. I left the jug out of doors when I went in there. From there I went to William Hill's. When I got there it was time for the lodge to have done been started. I saw Earn Ragsdale down there; he was on the porch talking to a girl. I scared him and he jumped back. I then talked to them a minute. I then had set the jug side of the road before I went in there. I stayed there and talked to them a minute and came out and got my jug. I told them if anybody said had they seen me to say they hadn't seen me. I was there talking to Earn and Earn Ragsdale heard me. I then went down to Toler's filling station and got gas. I put one gallon of gasoline in the jug and paid twenty-six for it. I then went down the road below Tuck's house and came out in the field to an old house. When I left Toler's filling station I went down Rosebud road. I did not turn out the same road I turned out before, the one below Tuck's house and then went by there to an old vacant house out in the field. I stayed there until the lodge broke up. The lodge was then going on while I was at this house and the lights were on there and I waited there until the lodge was out. After I saw the light go out I waited ten or fifteen minutes. I then dashed the gas in front of the lodge, the schoolhouse. That schoolhouse had two doors, an outside door and an inner door. One was this way and one this way (indi-

cating). It had a vestibule. I was right at the door. I think the front door was locked. I was on the porch where you walk up there. Then I came on back. I set fire to it; I struck a match. I stood there until I saw it catch and I went across the field and set the jug down in a ditch, in a small ditch that goes into the big ditch. I did not carry it off. I just set it down. It was then half full of gas. I then went to the Rosebud Road and went straight across the intersection and down below Dr. Floyd's house and went through Dr. Floyd's yard. I then went to a woman named Flora Gordon's. I got there something about ten o'clock. I don't believe I had been there half an hour when the fire alarm went off. I did not see the fire at the time when the fire alarm first rang. I then went to the top of the hill where Mount Zion had burned down. How I know it was about ten o'clock is I estimated it by the time the show turned out; when I went through town the picture show was turning out. It turns out about around ten o'clock. I then went straight on. I then spent the night with Flora Gordon until about day at Flora's house. There was no one at the house but her and another lady, Willie Mae Blasingame. I had been to Flora Gordon's that afternoon late, just before dark. As to how I happened to do go there this same day that the schoolhouse was burned, I generally goes there when I get away from my old lady. As to whether it was about seven o'clock, it was time for me to go and feed my hogs and things. I didn't stay then at Flora's so long. It was getting dark when I left and I then went home. After I got home that is when, I left and went back to my mother's house and then to Alfred's and then Hill's and then on over to the old vacant house. That is where I stayed watching the folks at the lodge. As to whether Maggie ever talked about this thing, she said, 'they would happen to some bad luck by not paying it.' Nobody had any part in this burning except me. I did not tell anybody about it. Nobody told me to do it. Nobody has threatened' me to make me tell this. Nobody has promised me anything if I told it. How I came to tell it is they come and got me. When I was questioned about it I decided it was best to go on and tell it. I have been reading my Bible while I was in jail and I decided the best thing I could do was to tell the truth about it. That is the truth what

I have told you. When you [I?] got back from the first burning at Mount Zion Church my mother Maggie was in the house, Maggie Catlin, and Minnie, Annie Rice Martin, and my wife Ollie May Grimes and there might have been somebody else, my sister might have been there. When I got back there it was around two o'clock. Somebody might have woke up but nobody said anything. As to how they happened to get up later on, my mother heard the fire alarm and a fellow named Charlie Kelly blew out in front of the house and got up and waked me and asked me if I wanted to ride down there and I went. I went back to Friendship Church the night it burned. The night Friendship burned I did not see anybody in a truck coming back across the highway; when that truck came by it looked like to have hit my uncle crossing the road; he went to the fire and he had run back to his house to get his gun and shoot it and then got on his bicycle and went back. That is exactly what happened. While he was crossing the highway to come back to his house the big truck almost hit him. The truck stayed there and blew and Alfred went across the road going back from the fire and the truck cranked up and he was running and he liked to have run into it. That truck was coming from Monroe towards Atlanta. The truck had stopped and when it started it almost hit him. The reason I did this was on account of the way I felt that they had mistreated my mother about the insurance money; I didn't have no other cause; it got on my mind and I was jumpy. That is right what I said then. The date that Friendship Church was burned might have been October 3. The schoolhouse was burned the night of November 21st."

The defendant said that he burned the buildings alleged in the indictment. He said it repeatedly at different times and to different persons among whom were the sheriff of the county, the mayor of the town, the preacher of his own church, the insurance investigator for the territory in which the churches were located, and to another colored man with whom he was in jail while awaiting trial. Under the evidence the jury was authorized to find the confession was freely and voluntarily made.

"In a case of arson, the corpus delicti consists of two fundamental facts: first, the burning of the house described in the indictment, and second, the fact that a criminal agency was the

cause of the burning." *West v. State,* 6 *Ga. App.* 105 (64 S. E. 130). "The corpus delicti may be proved, with other elements of the offense, by circumstantial evidence. The surrounding circumstances, such as the isolation of the premises, the absence of any natural cause for the fire, the precautions taken to avoid a fire, or other facts of similar import, may be deemed adequate evidence of the incendiary origin of the blaze. . . The presence of oil or other inflammable material, if not normally kept upon the premises, is indicative of a criminal fire. The facts which are presented to show the responsibility of the defendant may aid in establishing the corpus delicti. Of such, are the motive and opportunity of the accused, his prior threats, subsequent admissions of fact, and suspicious conduct on his part. It cannot be proved solely by the confession of the accused; but, if sufficient evidence of the corpus delicti has been presented so that a confession of the accused is admissible, the confession can be considered as additional evidence of crime. . . The mere possibility that the fire was occasioned by spontaneous combustion or by some other cause innocent of criminal intent, does not demand an acquittal, for the jury must act on probabilities, not possibilities." Curtis, The Law of Arson (1936 Ed.), § 486, p. 528 et seq. "Where the corpus delicti has been established by independent evidence, in passing on the credibility or reasonableness of this independent evidence the jury may then consider the confession along with the independent evidence in determining whether the corpus delicti has been proved. In other words, where the corpus delicti has been prima facie established by independent evidence, the confession may then be considered by the jury, in addition thereto, in determining whether the corpus delicti has been satisfactorily proven." *Grimes v. State,* 204 *Ga.* 854 (51 S. E. 2d, 797); *Logue v. State,* 198 *Ga.* 672 (32 S. E. 2d, 397).

In the instant case, A. L. Sellars, a policeman of the City of Loganville, investigated the burning of the Mt. Zion Methodist Church, which occurred about twelve or one o'clock on August 22 or 23, 1947. He testified: "I believe the weather was kind of misty. I am familiar with that church, how it was built and so forth. It was a wooden structure. There was ordinary grounds around it. There wasn't any brush there. If there had

been any there it was not in bad condition before the fire. There was no inflammable material around the church that I know of. As to whether I could tell in what portion the church was burned from the front to the rear as the front part had already fallen in and the other part hadn't [when I got there]. . . As to what happened when they shot water to it [the schoolhouse], every where they put the water on the fire it would start and flare up again. I [It?] would stop an instant and then flare up again. In other words, the water would not put the fire out."

Charles M. Huguley, special agent of the National Board of Fire Underwriters, testified: "I have been with the Fire Underwriters sixteen years. My job with them is the investigation of arson. In that capacity I have had a great deal of experience with fires and their cause and effects and what caused them, and the effects of fire. As to whether if a fire is burning and water is put upon that fire and it only puts it out temporarily and does not extinguish it what that illustrates, a fire burning on the floor in a vestibule and you throw water in on the fire, where there is a fire the fire is generally extinguished when the surface is covered with water. The fire there is extinguished, and then, when the fire flares up again and again and again that would indicate the presence of a volatile liquid. I would say gasoline is a volatile liquid."

The testimony of these two witnesses stated circumstances which would, in connection with other circumstances, authorize the jury to find that someone threw gasoline on the front part of the schoolhouse and then set fire to it. This evidence would also corroborate the defendant's confession that it was he who did so.

Willie Malcom, a witness for the State, testified: "He [the defendant] told us where he had the jug [which he said contained the gasoline which he said he used in burning the schoolhouse] below the schoolhouse in the ditch and we went in the ditch and didn't see it, and he said somebody must have moved it. We saw a place where the defendant showed us where it was. It was a little ditch concern and little bushes. There was a place there where a jug could have set. I seen some tracks the way he said he went. . . I don't know whether they resembled the tracks of Isaiah or not."

There was other testimony introduced that Isaiah Grimes, the defendant, was the son of Maggie Catlin and the stepson of Fluke Catlin, and that Fluke Catlin had taken out two insurance policies on his life with two separate fraternal lodges, one policy was with the Home Mission Lodge which held its meetings in the Mt. Zion Church, and the other policy was with the Faith, Hope & Charity Lodge which held its meetings in the Friendship Church. The beneficiary named in both the policies was Minnie Catlin, the minor adopted daughter of Catlin and the foster sister of Isaiah Grimes, the defendant. Fluke Catlin died of a wound or wounds received when his house burned. Maggie Catlin, mother of the defendant and wife of Fluke Catlin and foster mother of Minnie Catlin, demanded payment of the policies to Minnie Catlin, the beneficiary, notwithstanding she was still a minor.

Luther Gordon, who seems to have been an official of both of the lodges, Home Mission and Faith, Hope & Charity, testified that Maggie Catlin made a demand on him in the street and made her first demand on the Home Mission Lodge at one of its meetings in the Mt. Zion Church. The lodge would not pay the demand to her because the beneficiary, Minnie Catlin, was a minor and the mother had no lawful authority to collect it. Thereafter the lodge members left the Mt. Zion Church at about 9 or 10 o'clock and the church was burned that night about 12 or 1 o'clock.

Luke Streeter, the doorkeeper of the lodge, testified: "I remember the occasion when Maggie came down there to the lodge. The lodge was in meeting there. Luther Gordon was head of the lodge. . . Isaiah came there with her, five of them came there, Maggie and Isaiah [the defendant], Willie Malcom and Maggie's daughter Eliza May and the little girl. I don't know the name of the little girl. That was Fluke's adopted daughter [Minnie Catlin]. They were making a lot of racket out there and they authorized me to go out there and to get them to stop making a fuss, and Maggie Catlin said she wanted her money and I told Maggie the lodge was meeting, and she said she wanted the lodge money on account of Fluke's death; that is what she wanted, she said; and she kept raising a fuss

and I went out there to stop her. She said she was going to have that money before she left there. As to what else she said, I left."

Luther Gordon also testified: "I saw Isaiah get some gasoline. He did not get any gasoline from me. I remember a five-gallon can he had. He got some gasoline to saw wood; he got the gasoline to saw the wood. He got three or four gallons, I think, and got it in a big can. It was a big old square can. He got the gasoline to saw wood. That was before the first church burned."

Charles Kelly, sworn for the defendant, testified: "I recall the night last August when the Mt. Zion Church was burned. I recall seeing Isaiah Grimes that night. Isaiah lives on the other side of me [from Mt. Zion Church]; at that time he was living at Mr. Jim Moore's farm which is a half or three-quarters of a mile beyond my house. I saw him and I saw the fire. I saw the fire and after that I saw Isaiah. I picked him up in the highway just about a hundred or so feet outside of my house. He was trotting along the highway towards the fire. That was just about half a mile from where he was living then. He was coming from the direction where he lived from that direction towards the fire. It was about a hundred or a hundred and fifty feet from where I picked him up to the front of my house; I had just come out of the driveway of my house. It was dark and he couldn't see me in the dark and I hollered to him and asked him if he was going to the fire and he didn't say anything but walked to the car, and when he got side of the car, I told him to get on the side of the car, and he did, he got on the side of the running board, and rode down the highway this side of the church and got off and went with the crowd, and I didn't see Isaiah any more that night. That was after midnight, about one o'clock. I could not recall exactly. It is just about half a mile from the point where I picked him up to the fire. . . That fire had burned a good long time before I ever started from home; it had burned a good little bit before I discovered it. I live on the west side of the highway and anybody could certainly have come through those fields and come to my house without coming on the road at all. Then I would say there would have been sufficient time for anybody to leave that church after the fire started and come by my house at the time I picked him up, because the church had practically burned down. I don't know

where Isaiah was before I saw him. He could have been to the church and come back around when I picked him up."

One of the witnesses for the defendant, Pearly Williams, on cross-examination stated that "she [Maggie Catlin, the mother of the defendant] said something about Luther Gordon being the cause of her not getting the insurance money, she said that Luther Gordon was a son of a bitch and she was going to get even with him, if he didn't pay her the money."

Relative to the burning of the Friendship Baptist Church, where the Faith, Hope & Charity Lodge had customarily held its meetings and where the Home Mission Lodge began to hold its meetings after the burning of the Mt. Zion Methodist Church, the Friendship Church burned on October 3, 1947, a little more than a month after the Mt. Zion Church burned.

A. L. Sellars testified: "The second church burned was Friendship Church. That Church was a wooden structure. It had a rock filler foundation. The front part was three and a half or four feet high and the back part practically on the ground. I know the grounds around that end of the church were in good shape. I would not think that there was any grass growing under the church that could catch fire. As to weather conditions, it was fair that night the best I recall; it was not lightning or anything of that kind. I don't know just how quick I got there to the fire after the alarm went off. As to the condition of the building at that time, it was almost falling in, part of it. I say it burned from the front to the rear; from my investigation I am satisfied that is true."

Luther Gordon testified: "The fire broke out at Friendship Church about eleven-thirty or twelve o'clock, but we didn't have no lodge there that night."

Alfred Grimes, an uncle of the defendant, testified: "At my house that night Friendship Church burned was we playing Florida String, me and my wife and Isaiah [the defendant] and Joe Woods, Uncle Bill, William Hill, Annie Rice Martin, and I don't remember who else. Some time before the fire occurred Isaiah and I were playing partners. As to whether you play a certain number of games, you play three games and if you win two you win, if you get two out of three you win. We call it rise and fly. Isaiah and I got beat in that. I rose and Isaiah rose too and

I got up and went in the kitchen and Isaiah went out and when I got back Isaiah was in there. I stayed in the kitchen *a pretty good while* and when I came back Isaiah was in the room. What happened then was Isaiah was in the room and Joe Woods came out there and said about the fire and we all come to the door then and came out. The fire was Friendship Church. . . I guess Friendship Church is *two or three blocks from my house.* . . We all went down there. The church seemed like it was burning in the front as it was going back that way, burning from the front to the rear. It looked like the fire was sweeping through the building. I don't know what happened to Isaiah after that." [The fire was] about a quarter to nine; it could not have been as late as ten o'clock." (Italics ours.)

The following evidence was introduced relative to the burning of the Loganville Colored School Building. Luther Gordon testified: ". . we had a meeting at the schoolhouse the night of the fire there. We left the schoolhouse at fifteen minutes to ten o'clock and we were back there in thirty minutes and it was afire. I don't know whether we were smoking there that night, but we didn't leave any fire. How I know that is I seen about the fire. There was smoking at the schoolhouse."

A. L. Sellars testified: "As to how quickly I got to the school, I suppose, from what they said about the crowd that left the schoolhouse, I was there in not more than fifteen minutes afterwards. I was able to get to the school before it caught fire very much. I went to the fire with the fire truck. The schoolhouse building has what I call a vestibule, about six feet by six feet, and the entrance is back of that that went into the main building. I went and looked in the building, and there was no fire in the inside of the building, and just in this vestibule it was in a solid flame and the fire had begun to burn the side of the house and it was afire along the edge. There was no evidence of fire inside of the building then."

William Hill, sworn for the State, testified: "I remember the night the schoolhouse burned. I live about four hundred yards from where Alfred Grimes lives. I live nearer to the schoolhouse than Alfred lives. I saw Isaiah Grimes that night. He came back to my house. That was somewhere around seven o'clock; it was dark; it was night. He came around the window and I

said to my wife, 'somebody passed that window,' and just about a second after I spoke about seeing somebody pass, Isaiah spoke. Earn Ragsdale was speaking to Isaiah, but Isaiah never did stop as I know of and Ragsdale said, 'Boy, you scared me,' and Isaiah came back to my house and kept on around and kept on going. I said that that happened early in the night. I did not see Isaiah any more. I don't know when the schoolhouse caught on fire but it was around ten o'clock. I saw it; I went to the front door."

In this case there was positive evidence that the Mt. Zion Church, the Friendship Church and the schoolhouse buildings in question were destroyed by fire; we think the surrounding circumstances were adequate to authorize the jury to find that the fires were of an incendiary origin. These surrounding circumstances were: the isolation of the buildings; the fact that the jury was authorized to find that gasoline or some volatile substance was used in burning at least one [the school building] of the buildings and that the defendant had bought gasoline prior to the first fire; the absence of any natural cause for the fire in any of the buildings; the precautions taken at the school building to avoid fire; the absence of any meeting at Friendship Church the night of its burning; the defendant's absence from home and presence in the vicinity of all of the fires on the nights that they occurred; the fact that the defendant, his mother, his foster sister, and two other persons had gone to the Mt. Zion Church and the mother had demanded payment under the insurance policy of the Home Mission Lodge, which was meeting in that church and payment had been refused and the church was burned thereafter on the same night; the fact that after the Mt. Zion Church had burned and the Home Mission Lodge transferred its meetings to Friendship Church, it was also burned; and that the Loganville Colored School Building also burned about a month after the Lodge transferred its meetings to it from the Friendship Church when it had burned. These were circumstances which appeared extraneous of the confession, and were sufficient to authorize the jury to find that the crime of arson had been committed. The confession itself was sufficient to connect the defendant therewith. *Bines* v. *State*, 118 *Ga.* 320, 325 (45 S. E. 376, 68 L. R. A. 33).

"It is not often possible to make out a case of arson by direct proof establishing the corpus delicti or showing the connection of the defendant with the commission of the crime, for arson is seldom committed except at an hour when there is small chance that the criminal will be actually observed in the execution of his nefarious purpose, and it is also generally easy to commit the crime by stealth, without the help of an accomplice, without the beating of drums or blare of trumpets or any betraying noises; and therefore circumstances must generally be depended upon not only to show the guilt of the accused, but to establish the corpus delicti. The rule that the circumstances proved should exclude every other reasonable hypothesis save the guilt of the accused should not be relaxed; but it does not follow that the criminal must go unwhipped of justice because absolute proof is not presented by the State. If there be enough shown to convince the jury beyond a reasonable doubt that the guilt of the accused has been established to the exclusion of every other reasonable hypothesis, and no other reasonable hypothesis is suggested by the evidence, and there is nothing to indicate that the jury failed to accord to the defendant every consideration to which he was entitled, a reviewing court will not arbitrarily say that the conviction should be set aside." *Wade* v. *State,* 16 *Ga. App.* 163, 167 (84 S. E. 593), and see State *v.* Wenger, 47 Wyom. 401 (38 Pac. 2d, 339), where this language of the *Wade* case was quoted with approval. "To sustain a conviction, it is not required that the evidence exclude every possibility or every inference that may be drawn from proved facts. It is only necessary to exclude reasonable inferences and reasonable hypotheses which may be drawn from the evidence under all the facts and circumstances surrounding the particular case." *Graves* v. *State,* 71 *Ga. App.* 96, 97 (30 S. E. 2d, 212) ; *Smith* v. *State,* 64 *Ga.* 605.

The defendant contended that he was not guilty of the charge of arson; that his confession was induced by fear and not freely and voluntarily given; and introduced a number of witnesses in an effort to establish his alibi that he was elsewhere when the fires were set or the buildings caught fire. The jury evidently did not accept his or his witnesses' version of the case. The evidence was conflicting but sufficient to support the verdict.

The instant case is differentiated from the case of *Grimes* v. *State,* 204 *Ga.* 854 (supra), in that here there is no reasonable inference which can be drawn from the evidence that the fires were accidental or that anyone else set fire to the buildings in question other than the defendant, while in that case there was a reasonable inference that the deceased had been drinking or was drunk and that the proximate cause of his death was the accidental turning over upon himself of a kerosene lamp from which he caught fire and from the burns so received he died.

2. We have carefully considered special ground 1 of the motion for a new trial and are of the opinion that this ground is not meritorious.

3. The third special ground is based upon an objection which is the same as the one urged to the identical instruction given in *Grimes* v. *State,* supra, which was there held not to be error; hence the ground here is not meritorious.

4. In special ground 2, the defendant objects to the following charge of the court: "The law presumes every fire to be accidental until the contrary appears. In order to support a conviction of arson it is necessary to show that the burning was not accidental or providentially caused, and the corpus delicti must be shown from other sources. The corpus delicti of an arson may be established by circumstantial evidence which must exclude every other reasonable hypothesis than that of a wilful and intentional burning, and must be so strong as to rebut the presumption that the fire was of providential or accidental origin. I charge you that the corpus delicti may be proved with other elements of the offense by circumstances, such as the isolation of the premises, if isolated, the absence of any natural cause for the fire, the precautions taken, if any, to avoid a fire, or other facts of similar import. Evidence, if any, that the accused had a motive for setting a fire, may be considered in showing the fire was of criminal origin rather than of accidental origin." One ground of the defendant's objection to this charge is that the court erred in failing to charge that in order to prove the corpus delicti the jury must find beyond a reasonable doubt that the burning was the result of a criminal agency.

" 'It is not the duty of the court to carve up the case into different propositions, and instruct the jury specifically on each

as to reasonable doubt, but to submit the case as a whole upon all the evidence, and instruct upon the subject of doubt in appropriate terms upon the whole case.' *Carr* v. *State*, 84 *Ga.* 250 [10 S. E. 626]." *Tolbert* v. *State*, 127 *Ga.* 827 (56 S. E. 1004); *Stowe* v. *State*, 51 *Ga. App.* 726 (2) (181 S. E. 419). Upon the foregoing authorities we hold that this ground of the objection is not meritorious.

Another ground of the defendant's objection to this charge is that "such charge was misleading in that it led the jury to believe that they could consider the alleged confession as one of the circumstances to be considered in determining whether there was adequate proof of the corpus delicti." There was other evidence in the record from which the jury might have inferred a motive on the part of the defendant besides his confession. This charge does not make mention of the confession, but in view of what has been said in division 1 of this opinion the charge complained of was not erroneous for any reason assigned.

The court did not err in overruling the motions for a new trial.

Pursuant to the act of the General Assembly, approved March 8, 1945 (Ga. L. 1945, p. 232), requiring that the whole court consider any case in which one of the judges dissents, this case was considered and decided by the court as a whole.

*Judgment affirmed. Sutton, C. J., and Felton, Gardner, and Parker, JJ., concur. Townsend, J., dissents.*

TOWNSEND, J., dissenting. As pointed out in the majority decision, a confession alone, uncorroborated by any other evidence shall not justify a conviction, and a conviction may be lawfully had upon a free and voluntary confession although the same is otherwise corroborated only by proof of the corpus delicti. However, it is my opinion that the evidence in these cases fails to sufficiently corroborate the confession, and that therefore the evidence is insufficient to support the verdicts. As I view the cases they are no stronger than *Grimes* v. *State*, 204 *Ga.* 854. There this same defendant was convicted of murder by burning. He confessed that he set his stepfather on fire by pouring kerosene from a lamp onto his clothing after knocking him down and rendering him unconscious and that in setting him afire he also set fire to the house and the furniture in the house where the deceased was at the time. In that case the Supreme Court held

as follows: "(1) While a confession is sufficient to authorize a conviction if corroborated by the corpus delicti, yet in the absence of extraneous evidence of all elements of the corpus delicti, the proof is insufficient to corroborate the confession." Although the crime charged there was murder and those charged here are arson, I think the rules of evidence as to sufficiency are the same in both kinds of cases, especially where the murder is alleged to have been committed by burning.

Therefore in view of the decision in *Grimes* v. *State,* supra, I am of the opinion that the circumstantial evidence in these cases is insufficient to establish the corpus delicti aliunde the confession.