**UNITED STATES of America,**
**Appellee,**

v.

**Martha L. WOODS,**
**Appellant.**

No. 72-2217.

United States Court of Appeals,
Fourth Circuit.

Argued May 9, 1973.

Decided Sept. 12, 1973.

Robert B. Barnhouse and Robert E. Cahill, Baltimore, Md. [Court-appointed counsel], for appellant.

Charles G. Bernstein, Asst. U. S. Atty. (George Beall, U. S. Atty., and Thomas L. Crowe, Asst. U. S. Atty., on brief), for appellee.

Before WINTER, FIELD and WIDENER, Circuit Judges.

WINTER, Circuit Judge:

Martha L. Woods was found guilty by a jury of murder in the first degree[1] and seven other charges of assault with intent to murder, attempt to murder, and mistreatment[2] of her eight-month-old pre-adoptive foster son, Paul David

---

1. 18 U.S.C. § 1111. The section was applicable because the operative events occurred at Aberdeen Proving Grounds, Maryland, a federal reservation.

2. Assault with intent to murder, 18 U.S.C. § 113(a) (three occasions); attempt to murder, 18 U.S.C. § 1113 (three occasions); mistreatment of minor, 18 U.S.C. §§ 7, 13, Ann.Code of Md., Art. 27 § 35A.

Woods. She had also been indicted and went to trial on three counts of assault, attempt to murder, and mistreatment of Judy Woods, her two-year-old adopted daughter, but the district court granted a judgment of acquittal on these charges. Mrs. Woods was sentenced to life imprisonment on the conviction of first degree murder, and she received various sentences on the other convictions, some to run concurrently with one another, and others to run consecutively.[3]

In this appeal, Mrs. Woods contends first that the government failed to prove beyond a reasonable doubt the corpus delicti of murder, both because the evidence concerning the death of Paul Woods failed to supply that proof and because evidence about her nine other children was not admissible for that purpose;[4] second, that even if such evidence of prior acts was admissible to prove corpus delicti, the evidence in this case was inadmissible because it was too insubstantial to prove that defendant caused the prior incidents; and third, that even if it was otherwise admissible, the jury was improperly instructed by the district court with regard to the consideration it might give to such evidence. A final contention is that on the conviction of first degree murder Mrs. Woods could have been sentenced under 18 U.S.C. § 4208(a)—a sentence the district court indicated that it was disposed to consider but was powerless to adopt

—instead of receiving a "straight" sentence for life. We find no merit in any of these contentions, and we affirm.

### I.

The issues before us arise from the manner in which the government, by necessity, undertook to prove its case. The government showed that Paul was born February 9, 1969, and that he spent the first five months of his life in a foster home. During that time his physical health was uneventful and he never suffered from any breathing problems or cyanosis (a blue color, principally around the lips, due to a lack of oxygen). At the time he was placed in Mrs. Woods' home, he was a normal, healthy baby.

Beginning August 4, 1969, a bizarre series of events occurred. Twice on that date, and once again on August 8, August 13, and August 20, Paul suffered instances of gasping for breath and turning blue from lack of oxygen. Each time he responded to mouth-to-mouth resuscitation, except on August 20, when he went into a coma which persisted until September 21, when he died at an age of slightly more than seven months. On each of these occasions the evidence indicated that Paul had been in Mrs. Woods' custody, and only Mrs. Woods had had access to him. On each occasion prior to August 20, Paul was taken to the hospital. On the first occasion, he was immediately released because an

3. Defendant was sentenced to imprisonment for a period of (a) twenty years on each of the three convictions of assault with intent to murder, (b) three years on each of three counts of attempt to murder, and (c) fifteen years for mistreatment of a minor. The sentences for attempt to murder were each made to run concurrently with the sentence for assault with intent to murder committed on the same date, and each of these three pairs of sentences were made to run consecutively with each other and with the sentence for mistreatment of a minor. Thus, the total commitment, in addition to the sentence of life imprisonment for first degree murder, was seventy-five years, and these total commitments were made to run concurrently with the sentence of life imprisonment. Except for the sentence for

life imprisonment, all sentences were imposed under 18 U.S.C. § 4208(a)(2), so as to permit the defendant to become eligible for parole at such time as the Board of Parole may determine.

4. As defendant's brief points out, if defendant is successful in this contention with respect to the charge of murder, she would be entitled to reversal on the remaining counts for the same reason and for the additional reason of prejudice in her trial on those counts. Accordingly, defendant argues only in the context of the charge of murder. We agree and in this opinion we will address ourselves only to the charge of murder, but what we say will be equally applicable to the remaining counts.

examination disclosed that he was apparently well. On the other occasions, even after several days' observation, no reason for his cyanosis or respiratory difficulties could be discovered.

To prove that Paul's death was neither accidental nor the result of natural causes,[5] the government presented the testimony of a forensic pathologist, Dr. DiMaio, who, based upon Paul's medical history, the records of his various hospitalizations, and the results of an autopsy which the pathologist had performed after Paul's death stated that Paul's death was not suicide or accident and that he found no evidence of natural death. Dr. DiMaio expressed his opinion as one of seventy-five percent certainty that Paul's death was homicide caused by smothering. Dr. DiMaio explained his twenty-five percent degree of doubt as being the possibility that Paul died naturally from a disease currently unknown to medical science, and he agreed that his doubt was a "reasonable doubt" within the standard definition given by the court.[6]

Next, the government showed that beginning in 1945 Mrs. Woods had had custody of, or access to, nine children who suffered a minimum of twenty episodes of cyanosis. Seven children died, while five had multiple episodes of cyanosis. Three of the children were her own natural born children; two were children she had adopted; one was a

niece; one was a nephew; and two were children of friends.

There follow a listing of the nine other children and a summary of the evidence, favorable to the government, concerning them:

*Judy Woods*

Judy was adopted by defendant and her husband, and while under the age of two, had at least six episodes of blueness and breathing difficulties. Two episodes occurred on December 12, 1967, and Judy was hospitalized for six days. Another occurred March 22, 1968, and another on February 10, 1969. On March 16, 1969, Judy turned blue but responded to mouth-to-mouth resuscitation. On September 9, 1969, there was another episode and Judy was admitted to Kirk Army Hospital and later The Johns Hopkins Hospital. During no hospitalization, nor as a result of any other medical examination or test, was any cause for cyanosis and breathing difficulties discovered. On each occasion that Judy experienced cyanosis she was alone with defendant. When Judy was removed from defendant's custody after her last discharge from the hospital, she never again suffered from any type of cyanotic condition.

*Charles Lewis Stewart*

Charles was defendant's first natural child and although born prematurely in

5. After being initially hospitalized at Kirk Army Hospital, Paul was transferred to The Johns Hopkins Hospital. The staff at Hopkins vigorously pursued the possibility that Paul was a victim of insecticide poisoning. A factor suggesting this possibility was the complaint of his parents that there had been frequent and extensive insecticide sprayings on the army base where they lived and a toxicology report prior to death suggested the possibility of insecticide poisoning. At trial, the government presented evidence to show that the quantity of insecticide shown in the toxicology report did not exceed that normally found as a result of eating foods that are sprayed with insecticides. There was evidence also that no other child on the army base had ever been

made ill from insecticide sprayings, that the amounts used at the base were within the prescribed safety limits, that Paul had not experienced difficulties from July 3, 1969, until August 4, 1969, when sprayings had been going on, and that there was a lack of correlation between the timing of the sprayings and the times when Paul became ill.

6. Out of the presence of the jury, Dr. DiMaio testified that if he gave consideration to the evidence concerning the nine other children, discussed infra in the text, his opinion would be that Paul was a victim of homicide beyond a reasonable doubt. The district court, however, refused to permit this testimony to be presented to the jury.

1946, was born without congenital malformation. When he was one month old, he experienced two episodes of cyanosis while being held in defendant's arms. When taken to the hospital, Charles appeared to be in no apparent distress and his hospital course was normal. Two days after he was released from the hospital, he died after an episode of coughing, choking, and turning blue. Although defendant presented alibi evidence to show that she was not present when he died, the government's proof was to the contrary. The cause of death listed on the death certificate ("enlarged thymus" and "status lymphaticus") was shown to have been a medical impossibility.

### Mary Elizabeth Huston

Mary was defendant's second born natural child and she was born in 1950. She died at the age of one month and twenty-seven days. Born prematurely, she spent the first three weeks of her life in a hospital and upon her release to defendant's care, she suffered four or five episodes of cyanosis at times when Mary was alone with her mother or in her care. She was hospitalized twice, and no medical reason for her cyanosis could be discovered. Her death occurred while she was in defendant's arms. The causes of death listed on her death certificate ("asphyxiation due to a mucous plug" and "patent foramen ovale") were shown to have been medically impossible or extremely unlikely.

### Carol Ann Huston

Carol was the defendant's third natural child. She was born January 22, 1952, and died at the age of three months and twenty-one days. She was shown to be a normal, healthy baby, but she experienced cyanosis on the day of her death when she was in the care and custody of her mother. The government's evidence showed that the cause of death listed on her death certificate ("epiglossitis" and "bronchopneumonia") must have been diagnosed after death without an autopsy and that the

diagnosis was medically impossible under these circumstances.

### John Wise

John was defendant's nephew who died December 26, 1946, at the age of three years and seven months and who was suffering from diphtheria at the time of his death. The government's evidence was that John died while he was in bed with the defendant and that three other children from the home who also suffered from diphtheria all survived.

### Lilly Marie Stewart

Lilly was defendant's niece who died May 18, 1958, at the age of fourteen months. The child's parents awoke one night to find the child in defendant's arms making a gurgling noise and appearing to be blue around the mouth. When rushed to the hospital, she was dead on arrival. No autopsy was performed.

### Eddie Thomas

Eddie, an eighteen-month-old child, and his seven or eight-year-old brother, David, were left with defendant while the mother visited her husband in the hospital. Eddie experienced cyanosis and was taken to the hospital. There he appeared well and was released. His mother observed a bruise on his neck when she bathed him later in the day. Defendant conceded that she had been alone with Eddie when he experienced breathing difficulties. Her explanation of the cause of the difficulty, i.e., a mucous block, was shown to have been a medical impossibility.

### Marlan Rash

Marlan was a child of a friend, who died on May 3, 1964, at the age of eighteen months. During the last five months of his life, he suffered three cyanotic attacks while in defendant's care. After the first attack he was hospitalized five days and suffered no seizures while in the hospital. An initial diagnosis of epilepsy was made. The second episode occurred four months later and

he was again hospitalized. The third episode occurred on the day he was released from the hospital from the second episode, and the child died. An autopsy failed to reveal a cause of death. The preliminary diagnosis of epilepsy was largely disproved.

In its rebuttal, the government presented the testimony of another pathologist who testified that, in his opinion, Paul was the victim of homicide by smothering.

The government offered no real evidence of any motive for any of the acts charged. Extensive pre-trial investigation of defendant's sanity failed to disclose any reason why she should not be tried. While the question of her sanity at the time of the alleged offenses was submitted to the jury, the jury's guilty verdicts indicated that it found her sane.

## II.

Defendant's contention that the government failed to prove the corpus delicti beyond a reasonable doubt rests upon the three propositions that (a) proof of the corpus delicti for culpable homicide requires proof of death of the alleged victim *and* proof that that death occurred by means other than suicide, accident or natural causes, in short, that death occurred by a criminal act, (b) evidence of other crimes is not admissible to show that the death of the alleged victim occurred by homicide, but (c) even if admissible, the proof of other crimes presented by the government in the instant case was not so clear and convincing as to permit the jury to find that Paul's death was homicide.

The government counters by asserting that (a) for culpable homicide, the corpus delicti is established by proof of the fact of death alone, i. e., a dead body; a guilty verdict would still require proof that the death was caused by the criminal agency of this defendant, (b) in any event, evidence of these prior acts was admissible to establish both the corpus delicti and the accused's criminality, and (c) the government evidence of defend-

ant's prior acts, combined with the evidence concerning the death of Paul Woods, was sufficient to permit the jury to find beyond a reasonable doubt that Paul's death was a culpable homicide perpetrated by defendant.

A. *General.* As recognized in VII Wigmore, Evidence § 2072 (1940), proof of homicide requires proof of three elements: proof of death, proof that death occurred through someone's criminality, and proof of the accused's identity as the perpetrator of the crime. According to Wigmore, "the term 'corpus delicti' . . . in its orthodox sense . . . signif[ies] merely the first of these elements . . . ." Id. p. 401. "But by most judges the term is made to include the second element also, i. e., *somebody's criminality.*" (emphasis in original). Id. p. 402. The "orthodox" view is a minority view and one that has not found wide acceptance in the United States. Most jurisdictions require proof of (a) death and (b) death by foul means to establish the corpus delicti of homicide.

The parties agree that in order to sustain defendant's convictions the government must have proved beyond a reasonable doubt that Paul's death was caused by culpable homicide and that defendant was the perpetrator of the crime. They also agree that the corpus delicti need not be proven beyond a reasonable doubt until the end of the government's case. We find it unnecessary therefore to choose between the "orthodox" and the majority view of what constitutes the corpus delicti, because, for the reasons which we will shortly express, we think that the evidence of incidents concerning the other children was admissible generally and was admissible specifically to prove corpus delicti, so that at the end of the government's case, it had fully met the burden which defendant contends was placed on it. Thus, we proceed directly to discuss whether proof of the prior events concerning the other children was legally admissible to prove that (a) Paul's death was the result of

culpable homicide and not of natural causes, and (b) defendant was the perpetrator of the crime.

◼ We state, at the outset, that if otherwise legally admissible, we have no doubt about the relevance of the proof and its probative effect to establish both propositions. The evidence of what happened to the other children was not, strictly speaking, evidence of other crimes. There was no evidence that defendant was an accused with respect to the deaths or respiratory difficulties of the other children, except for Judy. Simultaneously with her trial for crimes alleged against Paul, defendant was being tried for crimes alleged against Judy, but there was no direct proof of defendant's guilt and the district court ruled that the circumstantial evidence was insufficient for the government to have proved its case. Thus, with regard to no single child was there any legally sufficient proof that defendant had done any act which the law forbids. Only when all of the evidence concerning the nine other children and Paul is considered collectively is the conclusion impelled that the probability that some or all of the other deaths, cyanotic seizures, and respiratory deficiencies were accidental or attributable to natural causes was so remote, the truth must be that Paul and some or all of the other children died at the hands of the defendant. We think also that when the crime is one of infanticide or child abuse, evidence of repeated incidents is especially relevant because it may be the only evidence to prove the crime. A child of the age of Paul and of the others about whom evidence was received is a helpless, defenseless unit of human life. Such a child is too young, if he survives, to relate the facts concerning the attempt on his life, and too young, if he does not survive, to have exerted enough resistance that the marks of his cause of death will survive him. Absent the fortuitous presence of an eyewitness, infanticide or child abuse by suffocation would largely go unpunished. *See* Minnesota v. Loss, 295 Minn. 271, 204 N.W. 2d 404 (1973).

◼ B. *Admissibility of Evidence Generally.* The government and the defendant agree that evidence of other crimes is not admissible to prove that an accused is a bad person and therefore likely to have committed the crime in question. Indeed, the rule is beyond dispute: Michelson v. United States, 335 U.S. 469, 475–476, 69 S.Ct. 213, 93 L.Ed. 168 (1948); United States v. Baldivid, 465 F.2d 1277 (4 Cir. 1972), cert. denied, 409 U.S. 1047, 34 L.Ed.2d 499 (1972); United States v. Mastrototaro, 455 F.2d 802 (4 Cir. 1972), cert. denied, 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 666 (1972); United States v. Smith, 446 F.2d 200, 203 (4 Cir. 1971); United States v. Samuel, 431 F.2d 610, 612 (4 Cir. 1970); Benton v. United States, 233 F.2d 491 (4 Cir. 1956); Lovely v. United States, 169 F.2d 386 (4 Cir. 1948). Defendant argues that while there are certain recognized exceptions to this rule, the instant case cannot be fitted into any of them, emphasizing that corpus delicti is not an exception. McCormick on Evidence § 190 (Cleary Ed. 1972). The government, in meeting this approach, contends that the evidence was admissible on the theory that it tended to prove (a) the existence of a continuing plan,[7] (b) the handiwork or signature exception,[8] (c) that the acts alleged in the indictment were not inadvertent,

---

7. Makin v. Attorney General of New South Wales, [1894] A.C. 57 (P.C.1893) (N.S. Wales) and Regina v. Roden, 12 Cox Cr. 630 (1874) support this view. *Makin* was a prosecution for infanticide by a professional foster parent. Evidence that the bodies of twelve other infants, who had been entrusted to him with inadequate payment for their support, was held admissible. In *Roden*, a prosecution for infanticide by suffocation, evidence that three of defendant's other children died in her lap, was held admissible.

8. Rex. v. George Joseph Smith, [1914–15] All E.R.Rep. 262 ("Brides of Bath" case) and People v. Peete, 28 Cal.2d 306, 169 P. 2d 924 (1946) permitted proof of unique methods of previous homicides to establish guilt of the accused.

accidental, or unintentional, and (d) the defendant's identity as the perpetrator of the crime. We are inclined to agree with the defendant that the evidence was not admissible under the scheme or continuing plan exception because there was no evidence that defendant engaged in any scheme or plan, or, if so, the objective or motive. The evidence may have been admissible under the lack of accident exception, although ordinarily that exception is invoked only where an accused admits that he did the acts charged but denies the intent necessary to constitute a crime, or contends that he did the acts accidentally. McCormick, p. 450. However, in State v. Lapage, 57 N.H. 245, 294 (1876), there was dictum that under certain circumstances where several children of the same mother had died, evidence of the previous deaths ought to be admissible because of the unlikelihood of such deaths being accidental. Finally, the identity exception is not really an exception in its own right, but rather is spoken of as a supplementary purpose of another exception. McCormick, p. 451.

The handiwork or signature exception is the one which appears most applicable, although defendant's argument that cyanosis among infants is too common to constitute an unusual and distinctive device unerringly pointing to guilt on her part would not be without force, were it not for the fact that so many children at defendant's mercy experienced this condition. In the defendant's case, the "commonness" of the condition is outweighed by its frequency under circumstances where only defendant could have been the precipitating factor.

While we conclude that the evidence was admissible generally under the accident and signature exceptions, we prefer to place our decision upon a broader ground. Simply fitting evidence of this nature into an exception heretofore recognized is, to our minds, too mechanistic an approach.

█ McCormick, in listing the instances in which evidence of other crimes may be admissible, cautions "that the list is not complete, for the range of relevancy outside the ban is almost infinite . . . ." Id. 448. And then, McCormick states:

[S]ome of the wiser opinions (especially recent ones) recognize that the problem is not merely one of pigeonholing, but one of balancing, on the one side, the actual need for the other crimes evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other crimes evidence in supporting the issue, and on · the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility.

Id. p. 453. This approach is one which finds support in Dirring v. United States, 328 F.2d 512 (1 Cir. 1964), cert. denied, 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964); and United States v. Hines, 470 F.2d 225 (3 Cir. 1972), cert. den. 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973). See also United States v. Hallman, 142 U.S.App.D.C. 93, 439 F.2d 603 (D.C. Cir. 1971). These cases stand for the proposition that evidence of other offenses may be received, if relevant, for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime, provided that the trial judge may exclude the evidence if its probative value is outweighed by the risk that its admission will create a substantial danger of undue prejudice to the accused.[9]

---

9. The proposed Federal Rules of Evidence, which the Supreme Court transmitted to Congress on November 20, 1972, embody the holdings of these cases. Rule 402 permits the admission of all "relevant" evidence. Rule 403 permits "relevant" evidence to be excluded if its probative value is outweighed, *inter alia*, by the danger of unfair prejudice. Rule 404 provides that evidence of other crimes is not admissible to prove "the character of a person in order to show that he acted in conformity therewith."

As we stated at the outset, we think that the evidence would prove that a crime had been committed because of the remoteness of the possibility that so many infants in the care and custody of defendant would suffer cyanotic episodes and respiratory difficulties if they were not induced by the defendant's wrongdoing, and at the same time, would prove the identity of defendant as the wrongdoer. Indeed, the evidence is so persuasive and so necessary in case of infanticide or other child abuse by suffocation if the wrongdoer is to be apprehended, that we think that its relevance clearly outweighs its prejudicial effect on the jury.[10] We reject defendant's argument that the proof was not so clear and convincing that its admissibility should not be sustained. As we stated at the outset, if the evidence with regard to each child is considered separately, it is true that some of the incidents are less conclusive than others; but we think the incidents must be considered collectively, and when they are, an unmistakable pattern emerges. That pattern overwhelmingly establishes defendant's guilt.

C. *Admissibility of Evidence to Prove Corpus Delicti.* For the reasons stated, the sufficiency of the evidence of (a) what happened to the other children, (b) proof of the fact of Paul's death, and (c) the government's expert testimony of the probable cause of death, to prove the corpus delicti was apparent. Defendant argues strenuously, however, that even if admissible for other pur-

poses, the law does not permit evidence of prior acts to be employed to prove the corpus delicti, relying principally upon 1 Wharton's Criminal Evidence, § 233 pp. 498–500 (12 ed. 1955), which states the rule claimed by defendant and cites upon State v. Donaluzzi, 94 Vt. 142, 109 A. 57 (1920) to support the statement. *Donaluzzi* is weak authority for the rule that evidence of other acts may not be used to prove the corpus delicti.[11] The opinion in *Donaluzzi* may be read to mean only that the exclusive use of prior acts, without more, cannot establish the corpus delicti. This contrasts with the present case where there was independent proof of the corpus delicti in the circumstances of Paul's death, although not beyond a reasonable doubt. In fact, in *Donaluzzi*, the court did find that evidence of the prior act was relevant and there was no error in its admission, so that the statement that the evidence was not admissible to prove the corpus delicti appears to be dictum. The other authorities on which defendant relies seem little stronger. They were either cases in which there was a total lack of any evidence of corpus delicti, or mere dictum that corpus delicti might not be proved by evidence of prior acts.[12]

Counsel have not cited, nor have we found, any case which considers whether or not prior acts can be used to establish the corpus delicti of murder, but the law seems clear that prior acts can be proved to establish the corpus delicti of arson,[13] and also that a confes-

---

Rule 404 would not, however, exclude evidence of other crimes when offered "for other purposes." *See also* our recent decision in U. S. v. Baggett, 481 F.2d 114 (June 19, 1973).

10. Although the average juror, when confronted with such evidence, could have little doubt of defendant's guilt, it is not unlikely that, in view of the abundant evidence of defendant's emotional distress at the loss or illness of each child, he would recognize that there was a pitiable absence of some factor in defendant's personality which would permit her to engage in such repeated conduct.

11. In the 13th edition of Wharton, the statement of the rule and the citation to

*Donaluzzi* have been omitted from the section corresponding to § 233. 1 Wharton's Criminal Evidence § 241 (13 ed. 1972).

12. Wollaston v. State, 358 P.2d 1111 (Okl. Cr.1961), (dictum); Lewis v. State, 335 P. 2d 654 (Okl.Cr.1959) (dictum); Wrather v. State, 179 Tenn. 666, 169 S.W.2d 854 (1943) (prior acts too inconclusive to be relevant); State v. Sherrill, 7 S.W.2d 725 (St. Louis, Mo.Ct.App.1928) (total lack of proof of corpus delicti); State v. Davis, 315 Mo. 1285, 292 S.W. 430 (1926) (total lack of proof of corpus delicti).

13. State v. Schleigh, 210 Or. 155, 310 P.2d 341, 348 (1957) (repeated fires by spontaneous combustion unlikely; eight fires along one country road immediately after defend-

sion may be relied upon to prove the corpus delicti if there is other corroborating evidence, short of independent proof of the corpus delicti, to prove the reliability of the confession.[14] The rule in cases of arson would seem equally applicable in cases of murder, and the rule with regard to confessions bears a close analogy to the use of other acts to prove murder. We therefore hold that in the instant case proof of the incidents involving other children was admissible to prove the corpus delicti of murder and other acts of child abuse.

**D.** *Alleged Errors in Instructions Regarding Consideration of Evidence of Prior Acts.* The district court did not comment on the evidence of the case, but it instructed the jury that "[t]he defendant is not on trial for any act or conduct not alleged in those [the first eight] . . . counts of the indictment." With regard to the charge of murder, it instructed that premeditation and malice aforethought were necessary elements of the crime and that "[n]o fact, no matter how small, no circumstance, no matter how trivial, which bears upon the questions of malice aforethought and premeditation should escape careful consideration by you as members of the jury."

■ Defendant contends that it was error for the district court to have declined to instruct in accordance with her requests Nos. 8 and 14.[15] While defendant concedes that the first sentence of her requested instruction No. 14 was given, she contends that it was error for the district court not to have limited the

---

ant, his father and others drove by show "a deliberate plan to set them") ; State v. Smith, 221 S.W.2d 158 (Mo.1949) (proof of prior fire was admissible to show that fire charged in indictment was incendiary) ; People v. Wolf, 334 Ill. 218, 165 N.E. 619 (1929) (proof of separate fires admissible to prove corpus delicti) ; State v. Ritter, 288 Mo. 381, 231 S.W. 606 (1921) (proof of prior fires admissible to prove the corpus delicti) ; People v. Jones, 123 Cal. 65, 55 P. 698 (1898) (proof of burning of other buildings admissible to prove corpus delicti). Contra: Kahn v. State, 182 Ind. 1, 105 N.E. 385 (1914).

14. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954) ; United States v. Waller, 326 F.2d 314 (4 Cir. 1963), cert. denied, 377 U.S. 946, 84 S.Ct. 1355, 12 L.Ed.2d 309 (1964) ; Jordan v. United States, 60 F.2d 4 (4 Cir.), cert. denied, 287 U.S. 633, 53 S.Ct. 84, 77 L.Ed. 549 (1932) ; United States v. Ansani, 138 F. Supp. 454, 459 (N.D.Ill.1956), aff'd 240 F. 2d 216 (7 Cir. 1957), cert. denied sub nom., Milner v. United States, 353 U.S. 936, 77 S.Ct. 813, 1 L.Ed.2d 759 (1957).

15. Defendant's request No. 8 :
The fact that the accused may have committed an offense at some time is not any evidence or proof whatever that, at a later time, the accused committed the offense charged in the indictment (information), even though both offenses are of a like nature. Evidence as to an alleged earlier offense of a like nature may not therefore be considered by the jury, in determining whether the accused did the act charged in the indictment (information). Nor may such evidence be considered for any other purpose whatever, unless the jury first find that other evidence in the case, standing alone, establishes beyond a reasonable doubt that the accused did the act charged in the indictment (information).

If the jury should find beyond a reasonable doubt from the other evidence in the case that the accused did the act charged in the indictment (information) then the jury may consider evidence as to an alleged earlier offense of a like nature, in determining the state of mind or intent with which the accused did the act charged in the indictment (information). And where all of the elements of an alleged earlier offense of like nature are established by evidence which is clear and conclusive, the jury may, but is not obliged to, draw the inference and find that in doing the act charged in the indictment (information), the accused acted willfully and with specific intent, and not because of mistake or accident or other innocent reason.

Defendant's request No. 14 :
The defendant is not on trial for any act or conduct not alleged in those counts of the indictment, which refer to Paul David Woods. However, you have heard evidence of other instances and the Government seeks to establish by that evidence that the defendant knowingly and willfully committed the act with which she is charged. Therefore you may consider the evidence of other incidents for that limited purpose only and for that purpose you may give it such weight as you deem appropriate.

jury's consideration of prior offenses so that the jury might not consider them in deciding whether she committed the crimes charged in the indictment, and that such evidence could be considered by the jury only in determining her state of mind if they found from other evidence that the crimes were committed and that she was the criminal actor. Defendant's contentions are, of course, consistent with her position regarding the necessity of proof of corpus delicti by evidence other than that of the prior events, but we have decided these contentions adversely to her. It follows, we think, that her objections to the failure to charge should likewise be rejected. Unlike other cases where evidence of prior crimes is admissible for only limited purposes and where it is necessary or proper to give limiting instructions, evidence of the prior events was admissible here to prove both that Paul was the victim of infanticide and that defendant was the perpetrator of the crime. In this case, therefore, the district court was correct in not limiting the jury's consideration of the proof of prior events as requested by defendant.

Defendant also contends that when it granted a judgment of acquittal on the three counts charging abuse of Judy at the close of the government's case, the district court was in error in permitting the jury to consider the evidence concerning Judy in determining defendant's guilt or innocence of Paul's death. In submitting the case to the jury with respect to Paul, the district court instructed, "[a]lthough this Court has granted the motion for acquittal of the defendant as to the three counts of the indictment relating to Judy Woods, nevertheless, testimony concerning events allegedly relating to Judy Woods on or about September 9, 1969, and the other times

and testimony also allegedly relating to other children may be taken into account by you in connection with the eight counts of the indictment relating to Paul Woods." An examination of the record shows that the court granted the motion for judgment of acquittal as to the counts relating to Judy on the theory that only defendant's uncorroborated statements indicated that Judy had suffered cyanosis and, lacking independent corroboration, these statements were legally insufficient to establish the commission of a crime.[16] The defendant's argument is grounded primarily on Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and United States v. Kramer, 289 F.2d 909 (2 Cir. 1961), which held that the doctrine of collateral estoppel applied in criminal prosecutions, i.e., "that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." 397 U.S. at 443, 90 S.Ct. at 1194.

Collateral estoppel bars relitigation in subsequent proceedings of those determinations of fact, and mixed fact and law, that were essential to the original decision. Yates v. United States, 354 U.S. 298, 336, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). The doctrine also bars a party from attempting to prove a second time a fact he sought unsuccessfully to prove in a prior action, since "the nonexistence of a fact may be established by a judgment no less than its existence." *Yates,* at 335, 77 S.Ct. at 1085; Sealfon v. United States, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948). *Ashe* and *Sealfon* are authority for examining the complete record of the initial trial to determine what has been litigated and decided.

---

16. The government argues that under *Opper* and *Smith,* supra, it had produced sufficient evidence to justify denial of the defendant's motion for judgment of acquittal. That evidence consisted of the words of the defendant as embodied in the hospital records, the fact that Judy was taken to two hospitals where she appeared well, the medical testimony with respect to symptoms of cyanosis and how the symptoms can be brought about, and the prior acts of the defendant. We express no view, however, on the correctness of the district court's ruling.

In this case, the "ultimate" fact or "fact essential to the original decision" with regard to Judy was that the government had failed to introduce sufficient evidence independent of defendant's statements to corroborate those statements and establish that a crime had been committed against Judy. The district court's ruling did not discredit or otherwise reach any conclusion as to the statements themselves; their independent relevance or legitimacy was not a fact ultimate or essential to the ruling.

Our reading is supported by the simple fact that in considering the charges involving Paul, the district court instructed the jury that it might consider the evidence concerning Judy. We could not lightly presume that the court would permit the jury to consider the evidence concerning Judy if it had concluded that defendant was innocent of misconduct toward Judy rather than that there was a mere technical failure of proof to prove such conduct.

■ In our view, therefore, the verdict of acquittal with respect to Judy did not constitute an adjudication that defendant committed no acts of misconduct against Judy. The defendant's statements regarding Judy were sufficiently relevant, incriminating and necessary for the prosecution, to overbalance any prejudice they might cause, thus meeting the test for admissibility of prior acts. The government properly continued to use these statements as evidence tending to prove, together with evidence concerning the other children, that defendant had committed a criminal act against Paul.

### III.

■ Defendant's final contention is that the district court was in error when it concluded that upon the verdict of guilty of first degree murder of Paul, defendant could not be sentenced to life imprisonment under 18 U.S.C. § 4208(a)(2) so as to render her eligible for parole at any time that the Parole Board might determine. We find no merit in the contention.

Since the decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L. Ed.2d 346 (1972), the statute under which defendant was convicted of first degree murder, 18 U.S.C. § 1111, provides as the only possible sentence "imprisonment for life." Additionally, the government did not ask for the death penalty in this case. Of course, 18 U.S. C. § 4202 also applies and that statute makes fifteen years' incarceration a condition precedent to parole eligibility for offenders sentenced to life imprisonment.

Section 4208(a)(2), which permits a district court to make a sentenced offender eligible for parole at such time as the Parole Board may determine, irrespective of any other requirement fixing a minimum sentence as a condition precedent to parole eligibility, was enacted as part of § 4208 by Pub.L. 85–752, 72 Stat. 845 (August 25, 1958). Section 7 of Pub.L. 85–752 by its terms states that § 4208 "does not apply to any offense for which there is provided a mandatory penalty", and the legislative history of Pub.L. 85–752 stated that the purpose of the enactment was "to assure that the mandatory penalties provided by statute for special categories of crime, such as armed robbery of a post office . . . shall not be affected." S.Rep. No. 2013 (1958); 2 U.S.Code Cong. and Admin.News, 85th Cong., 2nd Sess. 3892 (1958). At the time of its enactment, the penalty for armed robbery of a post office was twenty-five years, with no statutory provision authorizing the imposition of a lesser penalty. The penalty for armed robbery of a post office has accordingly been considered a mandatory penalty by federal courts and one which may not be imposed under § 4208(a)(2). United States v. Cameron, 351 F.2d 448 (7 Cir. 1965); United States v. Hardaway, 350 F.2d 1021 (6 Cir. 1965). Additionally, the United States Court of Appeals for the District of Columbia Circuit has stated that the offense of first degree murder under the District of Columbia Code which carries a penalty of life imprisonment is a

"mandatory" penalty under Pub.L. 85–752, so that a defendant convicted of first degree murder may not be sentenced as a young adult offender under § 4209, which § 7 of Pub.L. 85–752 also makes inapplicable where a "mandatory" sentence is provided. United States v. Howard, 146 U.S.App.D.C. 10, 449 F.2d 1086, 1092–1093 (D.C. Cir. 1971).

We think that the life sentence provided for in 18 U.S.C. § 1111 is indistinguishable from the life sentence imposed for first degree murder under the District of Columbia Code. We are persuaded to follow the decisions of the Seventh, the Sixth and the District of Columbia Circuits which are direct authority for the conclusion that the district court in the instant case was without authority to impose a life sentence under § 4208(a)(2). We note that 18 U.S.C. § 3651 prohibits either probation or a suspended sentence for crimes punishable by life imprisonment, such as first degree murder, so that we are not met with the problem which troubled the court in Jones v. United States, 419 F.2d 593 (8 Cir. 1969); namely, that if the sentence for armed robbery of a post office under 18 U.S.C. § 2114 were deemed mandatory, a defendant found guilty could be placed on probation or given a suspended sentence but could not be made eligible for parole prior to serivce of one-third of the twenty-five year sentence.

Affirmed.

WIDENER, Circuit Judge (dissenting):

I respectfully dissent from the majority opinion as it relates to evidence of incidents concerning other children, and especially as it holds such evidence may be considered proof of the *corpus delicti* (which may include the criminal agency of the accused). I agree with part III of the opinion concerning the sentence.

While I do not agree with the majority that the evidence of prior occurrences was admissible under either the signature exception or to show lack of accident, since the majority gives no reason for its holding, the reason for my dissent will not be further mentioned here. I treat the same my disagreement with the conclusion of the majority that the effect of such evidence, even if properly admitted, should not be limited by a proper instruction. I would find it unnecessary to consider the application of Ashe v. Swenson, supra, for the evidence concerning Judy should have been stricken from consideration for the same reasons the evidence concerning the other children should not have been admitted.

I am convinced that the defendant here did not receive a fair trial because the evidence of prior occurrences, fitting no recognized exception to the general rule, was so highly inflammatory and prejudicial, as well as being neither plain, nor clear, nor convincing, that it should not have been admitted for any purpose, much less for all purposes.

Through the years, the courts of this circuit have adhered to the general rule that evidence of crimes not alleged against the defendant within the indictment may not be adduced at trial as proof of the defendant's guilt. E. g., Benton v. United States, 233 F.2d 491 (4th Cir. 1956); Lovely v. United States, 169 F.2d 386 (4th Cir. 1948); Simpkins v. United States, 78 F.2d 594 (4th Cir. 1935).

The Supreme Court has adhered to the same rule which I consider binds us not only by way of precedent, but also as a matter of sound policy supported by reason and justice. Mr. Justice Jackson articulated the underlying considerations which support this accepted rule of criminal evidence in Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948):

"Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. . . . The State may not show defendant's prior trouble with the law, specific

criminal acts, or ill fame among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice." 335 U.S. 469, 475–476, 69 S.Ct. 213, 218, 93 L.Ed. 168.

In accord are Hall v. United States, 150 U.S. 76, 14 S.Ct. 22, 37 L.Ed. 1003 (1893) and Boyd v. United States, 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077 (1892). As we previously have stated, this is not merely a technical rule of law; rather, it reflects the "fundamental demand for justice and fairness which lies at the basis of our jurisprudence." Lovely v. United States, 169 F. 2d 386, 389 (4th Cir. 1948).

In applying the rule excluding evidence of a defendant's prior crimes or acts, we have recognized a number of circumscribed exceptions which may admit evidence introduced for some relevant purpose other than a showing that the defendant probably committed the crime. Accordingly, evidence of prior acts or crimes has been permitted for the limited purposes of proving knowledge, intent and motive.[1] Also, in appropriate circumstances, courts have admitted prior-crime evidence for several additional purposes. A case by case analysis of these decisions might yield the following exceptions: (1) to complete the story of the crime; (2) to show the existence of a larger continuing plan, scheme, or conspiracy; (3) to show that other crimes by the accused are so nearly identical as to earmark them as the handiwork of the accused; (4) to show a propensity toward illicit sexual relations with the particular person concerned; (5) to show that the act for which the accused is on trial was not inadvertent, accidental, unintentional or without knowledge; (6) to establish motive; (7) to show malice, deliberation or ill will; (8) to prove identity; (9) to show admissions by conduct tending to obstruct justice or to avoid punishment for the present crime; (10) to impeach the accused after he testifies on his own behalf. See McCormick on Evidence § 190, at 448–51 (2d ed. 1972).[2]

Even when the trial court determines that evidence of a prior act or crime is admissible as coming within one of the exceptions to the general rule, it still must determine whether the proof of the prior act is of a sufficient quality to permit its admissibility, and the courts have held, with considerable uniformity, that in cases falling under exceptions to the rule it is essential that proof of the prior act or offense be plain, clear and conclusive. Evidence concerning prior acts of a vague or uncertain character is not admissible. Kraft v. United States, 238 F.2d 794, 802 (8th Cir. 1956).[3] Consequently, it should be apparent that

---

1. United States v. Baldivid, 465 F.2d 1277 (4th Cir. 1972); United States v. Mastrototaro, 455 F.2d 802 (4th Cir.), cert. den., 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 666 (1972); United States v. Smith, 446 F.2d 200 (4th Cir. 1971); United States v. Samuel, 431 F.2d 610 (4th Cir. 1970); United States v. Dutsch, 357 F.2d 331 (4th Cir. 1966).

We said in *Samuel*, 431 F.2d at p. 612: "Such evidence is admissible only where it is relevant for some purposes other than to show that the accused, because he is a man of criminal character, committed the crime charged."

2. I have found no authority, and none has been cited to the court, which permits proof of prior crimes or acts, much less proof of prior occurrences, as an acceptable means of proving the *corpus delicti*. The majority agrees with this so far as homicide goes but finds exception for arson cases and cases involving confessions.

3. See also United States v. Machen, 430 F. 2d 523, 526 (7th Cir. 1970) (crisp, concise, and persuasive); Labiosa v. Canal, 198 F.2d 282, 284–285 (4th Cir. 1952) (clear).

evidence of prior merely suspicious occurrences is no substitute for clear and conclusive proof.

Yet, assuming that the proffered evidence of prior acts fits a given exception and is proven by clear and convincing evidence, considerable reputable authority maintains the court's inquiry as to admissibility is not even then completed. Careful consideration still should be given to the prejudicial potential of the evidence of other acts or crimes on the minds of the jurors. As Judge Sobeloff cautioned in his dissent in United States v. Baldivid, 465 F.2d 1277, 1283 (4th Cir. 1972), "the danger of undue preju-

dice is not cured merely because the evidence falls within an exception to the rule; the prejudice remains inherent in the testimony." [4]

In applying a balancing test, the considerations confronting the district court may be summarized succinctly: assuming an exception to the rule is applicable, before admitting evidence of prior acts or crimes, the court should determine, first, whether the evidence is relevant; secondly, whether the evidence is unduly prejudicial notwithstanding its relevancy; and, thirdly, having met both prior tests, whether the evidence is truly needed by the prosecution.[5]

---

**4.** See United States v. Phillips, 401 F.2d 301, 305–306 (7th Cir. 1968); DeVore v. United States, 368 F.2d 396 (9th Cir. 1966).

Compare the Proposed Federal Rules of Evidence, Rule 403, which offers a balancing test excluding relevant evidence under certain circumstances:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

"Unfair prejudice" is defined by the Advisory Committee as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

In *Baldivid*, the admissibility of the evidence under the intent and knowledge exception was acknowledged. The difference in the court was on the extent of the prejudice. Since the majority here does not depend on the signature or lack of accident exceptions, I need not apply the weighing test in precisely the same sense as applied by the dissent in *Baldivid*.

**5.** The majority alters the balance by weighing the relevance of the evidence plus the need for the evidence against the prejudice resulting to the defendant. It also applies the test without first finding an exception to gain admissibility. The infirmity in this formulation is that as the need for the evidence increases, the probative value may decrease and still the evidence will be admissible. This new test given effect by today's ruling, elevates need, if accompanied by the slightest probative value, to the status of an exception in compelling cases. This, of course, coupled with the absence of a limiting instruction, gives no protection to the

defendant in a case already clouded with emotional issues.

Indeed, I find that such emphasis on need comes perilously close to a rule in the law of evidence that the end may justify the means, and my inhibition at such a departure from the common law tradition is at the root of my dissent. While the executive branch of government must frequently, of necessity, make the decision as to need as against consequences in securing evidence, such a balance should not be given dignity by the courts in ascertaining admissibility absent an exception to the general rule. The use of need in any balancing test properly ought to be limited to applying, in a negative sense, an exclusionary rule, not to bolstering admissibility. McCormick on Evidence, 1954 Ed. § 157, clearly points this out, and advocates that the test be used as a further limit on admissibility, not as an extension of it.

Rule 403 of the proposed Federal Rules of Evidence (see n. 4) must be read together with Rule 404(b), quoted below, as adopting the existing rules of evidence, limited, however, as advocated by *McCormick* and Judge Sobeloff's dissent in *Baldivid*. The comment to Rule 404(b) explains the rule is so deeply imbedded in our jurisprudence as to assume almost constitutional proportions. Thus, the decision of the majority takes a new departure.

Rule 404(b)—

"(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subdivision does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Viewed in any light, the testimony offered by the government of prior incidents involving children other than Paul D. Woods was improperly admitted. Not only was it inadmissible to establish the *corpus delicti*, it also failed to meet the plain, clear and conclusive test as to the quality of proof required. The resulting prejudicial effect upon the jury so outweighed the probative value of the evidence that its admission was reversible error. I would grant a new trial.

The ancient doctrine of *corpus delicti* was developed to prevent conviction for a crime never committed. See 4 Blackstone, Commentaries, at 358–59 (Lewis ed. 1962). As one commentator has noted, "the execution of an innocent man is equally tragic no matter what caused justice to miscarry in his case, but it seems most shocking where the crime itself is found to have been nonexistent.[6] Accordingly, the common law adopted the two elements of *corpus delicti* in homicide cases and insisted that proof be made not only of the fact of the death of the victim, but also that death was occasioned by criminal means.[7]

Federal courts have recognized and applied this definition of *corpus delicti* in murder prosecutions, requiring that both elements be proved beyond a reasonable doubt.[8] In Evans v. United States, 122 F.2d 461, 465 (10th Cir. 1941), the court defined the scope of the doctrine in the following terms:

"The corpus delicti, as relates to homicide, is composed of two elements: (a) The death of the person alleged to have been killed; (b) that some criminal agency caused such death. . . Of course, both of these elements must be established beyond a reasonable doubt. When the jury find these established, the next inquiry is as to the identity of the criminal agency; and this, too, must be established beyond a reasonable doubt, but is properly no part of the corpus delicti."[9]

In the instant case, the government attempted to establish the *corpus delicti* and the criminal agency of the accused for the alleged murder of Paul Woods in two stages. The first stage involved the consideration of the testimony, hospital records and autopsy relating only to Paul Woods. The second stage involved the consideration of records and testimony, bolstered by the opinion of Dr. DeMaio, concerning past occurrences wherein other children had suffered illness under allegedly similar circumstances, some of whom died and some of whom did not.

Examination of the record forcibly demonstrates, as the majority opinion concedes, the failure of the government to establish either the *corpus delicti* or the criminal agency of the accused through evidence relating solely to Paul Woods. The government's principal witness on the subject of *corpus delicti* was Dr. Vincent J. DeMaio, the forensic pathologist who performed the autopsy on Paul. Before rendering an opinion, Dr. DeMaio considered the hospital records of Paul Woods at Johns Hopkins Hospital, Kirk Army Hospital, and Walter Reed General Hospital; the autopsy which he performed; and the oral testimony of witnesses pertaining to Paul Wood's history. Based upon those facts, Dr. DeMaio testified that he was only 75% certain that "the death was most probably a homicide." As a logical corollary, he admitted there was a 25%

6. Perkins, The Corpus Delicti of Murder, 48 Va.Law Rev. 173–74 (1962).

7. See, e. g., 1 Wharton's Criminal Evidence § 17 at 48 (12th ed. 1955); Lefave, Criminal Law § 4 at 16–17 (1972).

8. Evans v. United States, 122 F.2d 461, 465 (10th Cir. 1941), cert. den. 314 U.S. 698, 62 S.Ct. 478, 86 L.Ed. 558 (1942); Murray v. United States, 288 F. 1008, 1016, 53 App. D.C. 119 (1923).

9. The majority faces the problem squarely and decides that proof of prior occurrences is admissible to prove not only the death and criminal agency of someone, but also the criminal agency of the accused. Opinion p. 15–16. Cf. Bowie v. Commonwealth, 184 Va. 381, 389, 35 S.E.2d 345 (1945) (Proof of the charge compared). See also *Evans*, supra.

chance that the death of Paul Woods was due to natural causes.[10]

Unable to prove the *corpus delicti* utilizing evidence relating solely to Paul Woods, the government turned to evidence of past occurrences involving children other than Paul Woods. In my opinion, such evidence was improper on any account. It was not within any exception to the rule; it was highly prejudicial in the context of this trial; and most or all of such evidence failed to meet the required evidentiary standard of plain, clear and conclusive. Of equal force is the total lack of authority or precedent permitting use of evidence of other crimes, much less evidence of prior occurrences, to prove the *corpus delicti* in a homicide.[11]

Being unable to justify admitting the proffered evidence by the authorities, the majority draws analogies from arson and confession cases. Upon inspection, however, neither such class of cases offers persuasive support for use of evidence of prior occurrences to prove the criminal agency of the accused in a homicide trial. Analysis of People v. Wolf, supra, relied upon by the majority, for example, discloses that testimony of prior acts was admitted for the primary purpose of showing a connected scheme or purpose, i.e., to defraud an insurance company, and then apparently was allowed to be considered for all purposes. But where the issue has been squarely presented, courts have refused to admit such evidence to prove the *corpus delicti*

---

10. I am of opinion that evidence of a 75–25 percentage has no place in a criminal prosecution. It is an invasion of the province of the jury.

I am further very doubtful as to the relevancy and competency of most of Dr. DeMaio's testimony in view of at least two factors. First, the prior occurrences to which he testified were remote in time: Charles Stewart and John Wise died more than 25 years before trial; Mary E. Huston —21 years; Carol A. Huston—20 years; Lillie Marie Stewart—14 years; and Marlan Rash—8 years. See United States v. Machen, 430 F.2d 523, 526 (7th Cir. 1970). Second, Dr. DeMaio neither examined, attended, nor performed autopsies upon any of these children. The physicians who did were almost certainly more qualified to testify at trial as to the cause of death. Yet, their death certificates, presumed to be correct, have been allowed to be outweighed by opinion evidence arrived at in some cases twenty-five years later.

Death certificates were signed by physicians in each prior death, other than Marlan Rash. For him, the record contains an autopsy report. The following information may be summarized:

a. Charles Lewis Stewart—Ohio Death Cert. Exhibit 12–C. Died 8–23–46 of "Enlarged Thymus" and "Status Lymphaticus." Signed by John B. Gravis, M.D.
b. Mary Elizabeth Huston—Ohio Death Cert. Exhibit 13–D. Died 8–25–50 of "Asphyxiation due to mucous plug" and "patent foramen ovale." No autopsy. Signed by F. Richardson, M.D.
c. Carol Ann Huston—Ohio Death Cert. Exhibit 14–D. Died 5–12–52 of "Epiglot-

titus"—No autopsy. Signed by Sol Maggied, M.D.
d. John Wise—Ohio Death Cert. Exhibit 15–B. Died 12–26–46 of "diptheria." Signed by John B. Gravis, M.D. Autopsy performed (Exh. 15–C) by R. M. Hartwell.
e. Lillie Marie Stewart—Ohio Death Cert. Exhibit 16–B. Died 5–18–58 of "Fulminating pneumonia" and "broncholitis." Signed by Schmelzer, M.D. Whether autopsy performed is not indicated on certificate.
f. Marlan L. Rash—Colorado autopsy report. Exhibit 17–E. Signed by Lt. Col. Clearkin, M.D. Child died 5–4–64 of bronchiolitis. Autopsy performed immediately.

11. There is considerable authority supporting the proposition that evidence of other occurrences allegedly involving the accused is not admissible for the purpose of establishing the *corpus delicti* in a homicide case.

We have considered the very question presented here by way of dicta in *Lovely*, supra, 169 F.2d at p. 391, a rape case, in which we said by way of emphasis that evidence of a prior rape had no more tendency to establish a plan or scheme within the meaning of the rule " . . . *than similar incidents of a prior homicide or burglary would render evidence thereof admissible on a trial for those offenses.*" [Emphasis added]

With Judge Parker in *Lovely*, I find it impossible to understand a rule which will admit evidence as proof of guilt which would be inadmissible even as proof of the bad character of the defendant if she put the matter in issue. *Lovely*, p. 388.

of arson.[12] The confession cases, moreover, seem quite inapposite since the confession itself, if corroborated by substantial independent evidence, supplies the proof. The evidentiary problems, then, in confession cases, rather than relating to proof of the *corpus delicti* by proof of similar occurrences, should concern establishment of the trustworthiness of the confession and some independent evidence touching the *corpus delicti* so that the confession may be admitted.[13]

I am unable, then, to find support, either by precedent or by force of reasoning, for the position of the majority that evidence of prior occurrences is admissible to prove the *corpus delicti*, whether or not it may be said to include the criminal agency of the accused. Indeed, it is clear to me that such use of prior occurrences is an impermissible erosion of the policy underpinnings of the common law requirement of proof of *corpus delicti*. In the context of this trial, it has become a bootstrap operation allowing the government to circumvent proof of a major element of its case, and its allowance ought to be reversible error.

Regardless of the purpose for which evidence of prior occurrences is sought to be introduced, such evidence is never admissible unless proven by plain, clear, and conclusive evidence. Here lies the basis for an equally fundamental objection to the government's use of evidence of prior occurrences.[14]

In no instance cited by the government involving other children was the defendant convicted of the crimes alleged by the government; nor was she indicted or even charged with the commission of such crimes. To the contrary, in each instance involving the death of another child a formal death certificate or autopsy report was issued stating the child died of natural causes and naming the disorder.[15]

A brief review of the more compelling illustrations may be useful. Charles Lewis Stewart was born prematurely in 1946 and died less than two months later. The government's testimony involved a review by Dr. DeMaio of the death certificate and the hospital records. From those he gave an opinion that the cause of death could not have been an enlarged thymus as certified on the certificate since recent medical thinking has been that it is normal for children to have an enlarged thymus. Nevertheless, Dr. DeMaio admitted that the symptoms leading to the first hospital admission were as consistent with the diagnosed condition of malnutrition as they were with the government's theory of smothering. He admitted that, given malnutrition, he could not argue with a finding that the death was a natural crib death, which he stated is now generally the diagnosis for death which used to be attributed to an enlarged thymus.

The death in 1946 of John Wise, the defendant's nephew, offers another ex-

---

12. Kahn v. State, 182 Ind. 1, 105 N.E. 385 (Ind.1914). Reversing a lower court conviction of arson, the Indiana Supreme Court in *Kahn* noted:

"Other crimes than the one for which the defendant is upon trial are never permitted to be shown to prove the corpus delicti. It is only permissible in the trial of a criminal charge, in those cases where the act constituting the crime under investigation has been clearly established and the motive, intent, or guilty knowledge of the defendant is an issue." 105 N.E. 385, 386.

13. E. g., Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954);

United States v. Waller, 326 F.2d 314 (4th Cir. 1963), cert. den. 377 U.S. 946, 84 S.Ct. 1355, 12 L.Ed.2d 309 (1964).

14. See cases cited at note 3 and accompanying text. See also note 10.

15. As a general rule, death certificates are, by statute, prima facie evidence of the facts stated therein. Each of the states here involved had such provisions. Md.Code Ann. Art. 43 § 26 (Repl. vol. 1971); Colo.Rev. Statutes § 66-8-24 (1963); Ohio Rev.Code Ann. § 3705.05 (1953).

See also note 10.

ample where evidence of a prior occurrence fell far below the clear and convincing standard. According to the death certificate and the autopsy findings, John Wise died of diphtheria. The government's own proof established that two other children were taken from the same household during the same week to the hospital isolation unit with similar cases of severe diphtheria. The only evidence adduced by the government to challenge this finding of natural death was the statement by Dr. DeMaio that, had he performed the autopsy, he would have preferred to examine the neck organs in order to be certain of the diagnosis of diphtheria. Indeed, he admitted that the diagnosis was consistent with diphtheria.

The government's evidence also included five other occurrences where children in the defendant's presence or under her care suffered death. The death certificates are summarized in note 10. In each instance, Dr. DeMaio, the government's chief witness, stated his reasons for disagreeing with the specific findings in each death certificate or autopsy report. In every case, however, Dr. DeMaio was careful to state that the evidence was not inconsistent with a natural death. In my opinion, such evidence was inconclusive and failed dismally to meet the required standard of plain, clear, and conclusive.

In view of the highly prejudicial nature of the evidence of other deaths, it is clear that error in admitting evidence of any of the other deaths should entitle the defendant to a new trial. This is not a case of harmless error since "there is a reasonable possibility that [improper evidence] contributed to the conviction." Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

I feel that the admission of other-occurrence evidence severely impaired the fairness of this trial to the defendant. As the Supreme Court noted in Brinegar v. United States, 338 U.S. 160, 174, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949):

"Guilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property."

In my opinion, the defendant was denied those safeguards here.

I would reverse and remand for a new trial.